Michael VALERIO, on behalf of himself and all others similarly situated, and Yung Hao Chang, Plaintiffs,

v.

BOISE CASCADE CORP.; Boise Cascade Home & Land Corp.; Boise Cascade Recreation Communities Corp. of Delaware; Boise Cascade Credit Corp.; Hidden Valley Lake Association; Stonehouse Mutual Water Co.; Burger, Robbiebun; Horner, Jack; Hearn, Fred; Ray, Wayne; Percy, Orin; Carey, Kenneth; Lovitt & Hannan; Goldstein, Barceloux & Goldstein; Cotchett & Hutchinson; Breen, Young, Whitehead & Hoy; Beckland, Siner, Taketa & Salle; Barfield, Barfield, Dryden & Ruane; Stark, Stewart, Simon & Sparrowe; Murray, John J.; Watson, Frederick E.; Titcomb, Martin; Elke, Thomas; Attorney General of the State of California, Defendants.

No. C–77–0937 RFP.

United States District Court, N. D. California.

April 6, 1978.

On Motion to Dismiss Aug. 21, 1978.

Ernest M. Thayer, San Francisco, Cal., Edward L. Lascher, Lascher & Wilner, Ventura, Cal., for plaintiffs.

Frederick E. Watson, San Francisco, Cal., Thomas H. Gonser, Associate Gen. Counsel, Boise Cascade Corp., Boise, Idaho, Randall I. Barkan, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., William A. Fenwick, Edwin N. Lowe, Davis, Stafford, Kellman & Fenwick, Palo Alto, Cal., Julian Standen, Deputy Atty. Gen., San Francisco, Cal., C. Blaine Morley, Morley, Smith & Burke Law Corp., Palo Alto, Cal., Timothy W. Salter, Cardozo, Nickerson & Martelli, Modesto, Cal., Randall W. Wulff, Farella, Braun & Martel, David Ruby, Feeney & Sparks, Edward F. McFetridge, Hauerken, St. Clair, Zappettini & Hines, San Francisco, Cal., Roy M. Brisbois, Overton, Lyman & Prince, Los Angeles, Cal., Martin Titcomb, Barfield, Barfield, Dryden & Ruane, John J. Murray, Langer, Murray & Burke, Peter Anderson, Nancy E. Smith, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., Reginald A. Vitek, Seltzer, Caplan, Wilkins & McMahon, San Diego, Cal., for defendants.

OPINION

PECKHAM, Chief Judge.

On May 21, 1973, this court entered a final order certifying, for purposes of settlement only, the plaintiff class and approving the settlement in *McCubbrey v. Boise Cascade Home & Land Corporation,* No. C–72–0470 RFP. The instant class action was filed on May 6, 1977, by Michael Valerio and Yung Hao Chang, who were members of the *McCubbrey* class and participants in that settlement. Now, however, they seek an order vacating the *McCubbrey* judgment, "substituting the attorneys for plaintiffs herein for those who are now of record for plaintiffs in that action and placing the matter on the court's trial calendar." Plaintiffs' First Amended Complaint at 63. Their amended complaint also seeks $800,000,000 in damages and $1,000,000,000 in punitive damages as well as equitable relief for alleged violations of the Sherman Act, the Clayton Act, the Robinson-Patman Act, the Securities Act of 1933, the Securities Exchange Act of 1934, and pendent claims. Included in the pendent claims are claims against many of the private attorneys who represented the *McCubbrey* class and against the Attorney General of California for fraud and negligence allegedly arising out of breaches of contractual and fiduciary duties which breaches, it is claimed, were committed in the course of achieving the *McCubbrey* settlement.

On March 31, 1978, this court granted the summary judgment motions of the Attorney General and of the private attorney defendants (hereinafter these defendants collectively shall be referred to as the "attorney defendants" or simply the "defendants"). The court also denied the plaintiffs' cross motion for partial summary judgment. This opinion is in support of that order.

## I. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

The causes of action relevant to this discussion are stated in counts XV, XVII, XVIII, XXIV, and XXV of the Plaintiffs' First Amended Complaint. The first three counts allege fraud and deceit by the attor-

ney defendants in breach of their fiduciary duty to the *McCubbrey* class in that in the Notice of the proposed settlement they fraudulently misrepresented and concealed material facts and thereby induced the plaintiffs to enter into a settlement agreement that they otherwise would not have accepted.[1] Among other things, the defendants allegedly concealed "the fact that no minimum recovery per class member had been established," amended complaint ¶ 132(d); they concealed the "alleged liability" of plaintiffs for lot assessments, *id.* ¶ 132(f); and they implied that "each plaintiff would receive a substantial portion of his compensatory damages through the settlement." *Id.* ¶ 132(c). Counts XXIV and XXV allege that, by virtue of the fraud and deceit that are the basis of counts XV, XVII and XVIII, the defendants breached various written and oral contracts of employment with the *McCubbrey* class, count XXIV, as well as the covenant of good faith and fair dealing implied in said contracts, count XXV. These two counts are in essence claims for professional malpractice or negligence.

The defendants argue that many of the plaintiffs' claims are insufficient to state a claim for relief against the attorney defendants. We need not decide that question, however, as the court is convinced that any claims for relief based upon the allegations set forth in counts XV, XVII, XVIII, XXIV, and XXV are barred by the relevant statutes of limitation.

The statute of limitations defense raises two questions: the first is which statutes apply to this situation; the second question is when did the limitations periods begin to run.

A. *The Relevant Statutes of Limitation*

 The parties agree, and this court concurs, that the fraudulent representation and concealment claims of counts XV, XVII and XVIII are governed by section 338(4) of the California Code of Civil Procedure,

which states that the limitations period is three years for "an action for relief on the ground of fraud or mistake." Cal.Code Civ.P. § 338(4) (West Supp.1978). The parties, however, differ as to the applicable statute of limitations for counts XXIV and XXV. The defendants contend that the two-year limitations period for "an action upon a contract, obligation or liability not founded upon an instrument of writing," *id.* § 339(1), applies to those claims. The plaintiffs argue that the four-year statute of limitations applicable to "an action upon any contract, obligation or liability founded upon an instrument in writing," *id.* § 337(1), should govern the claims stated in counts XXIV and XXV. The "instrument in writing" upon which plaintiffs base their argument is this court's order certifying the *McCubbrey* class.

 We agree with the defendants that the applicable statute of limitations is section 339(1). The California courts consistently have held that a legal malpractice claim, whether brought as a tort action for negligent injury or as a contract action for a breach of an implied duty of care, is governed by the two-year limitations period. *Neel v. Magana, Olney, Levy, Cathcart & Gelfand,* 6 Cal.3d 176, 182, 98 Cal.Rptr. 837, 491 P.2d 421 (1971). *See also, Bedolla v. Logan & Frazer,* 52 Cal.App.3d 118, 125, 125 Cal.Rptr. 59 (1975). The courts have been equally consistent in their position that to bring the four-year limitations period into play "it is not sufficient that the cause of action is in some way remotely or indirectly connected with such an instrument or that the instrument is a link in the chain establishing the cause of action, but the instrument must, itself, contain a contract to do the thing for the nonperformance of which the action is brought." *Bernard v. Walkup,* 272 Cal.App.2d 595, 601, 77 Cal.Rptr. 544, 548 (1969); *McCarthy v. Mt. Tecarte Land and Water Co.,* 111 Cal. 328, 340, 43 P. 956 (1896). Neither our order certifying the *McCubbrey* class nor any oth-

---

1. The plaintiffs also argue in their memoranda that for these same reasons the Notice of the proposed *McCubbrey* settlement violated due process and hence the *McCubbrey* judgment is not binding upon them. This opinion does not address that contention.

er document presented to this court constitutes a written embodiment of the obligations that plaintiffs allege were breached. Accordingly, we hold that the two-year period of limitations, section 339(1), applies to counts XXIV and XXV.

## B. *The Running of the Limitations Periods*

Neither of the statutes of limitations applicable to this case begins to run until the plaintiff knows or should have known of the wrongful acts. More specifically, a cause of action for fraud accrues when the plaintiff discovers the wrongful acts or "has notice or information of circumstances to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his investigation." *Weir v. Snow,* 210 Cal.App.2d 283, 292, 26 Cal.Rptr. 868, 873 (1962). *See Bedolla v. Logan & Frazer, supra,* 52 Cal. App.3d at 125, 125 Cal.Rptr. 59. Similarly, a legal malpractice action does not accrue until the plaintiff knows or should know the material facts essential to show the elements of that cause of action. *Neel v.*

*Magana, supra,* 6 Cal.3d at 190, 98 Cal.Rptr. 837, 491 P.2d 421. The fact of injury alone has been found sufficient to commence the running of the statute of limitations for a legal malpractice action. *Budd v. Nixen,* 6 Cal.3d 195, 201, 98 Cal.Rptr. 849, 853, 491 P.2d 433, 437 (1971) ("the infliction of the damage will alert the client to the attorney's negligence and thus the statute of limitations will then begin to run on any malpractice action"). And the limitations period will begin to run even though the plaintiff may not have discovered every detail of the fraud, *Turner v. Lundquist,* 377 F.2d 44 (9th Cir. 1967), or all of his harm or injury. *Budd v. Nixen, supra,* 6 Cal.3d at 201, 98 Cal.Rptr. 849, 491 P.2d 433.

In the instant case the court need not struggle with the question of when plaintiffs "should have known."[2] Not only have the plaintiffs failed to meet their burden of proving facts that would excuse their failure to discover seasonably the basis for their present actions,[3] but they in fact had *actual knowledge* of at least one of the major frauds/breach more

**2.** A good argument can be made, however, that the statute of limitations began to run as of the date of this court's final order of May 21, 1973, if not sooner. As of that date essentially all of the information relevant to the alleged frauds, concealments, omissions, etc., was available to the plaintiffs. For example, plaintiffs claim that the defendants concealed the absence from the settlement of a requirement that the defendants in the original *McCubbrey* action register the securities described elsewhere in the instant complaint. Amended complaint ¶ 132(h). Both plaintiffs were aware that the settlement agreement was on file with the court and was available for inspection. Valerio deposition at 28; Chang deposition at 14. Examination of the settlement agreement would have revealed that it contained no such requirement.

**3.** California courts impose a heavy burden upon plaintiffs who, as in this case, bring their action after the apparent expiration of the statute of limitations. The plaintiffs must

> plead and prove the facts showing: (a) Lack of knowledge. (b) Lack of means of obtaining knowledge (in the exercise of reasonable diligence the facts could not have been discovered at an earlier date). (c) How and when he did actually discover the fraud or mistake. Under this rule constructive or pre-

sumed notice of knowledge are equivalent to knowledge.

*Casualty Ins. Co. v. Rees Inv. Co.,* 14 Cal. App.3d 716, 720, 92 Cal.Rptr. 857, 859 (1971) (emphasis in original); *Weir, supra,* 210 Cal. App. at 292, 26 Cal.Rptr. 868. Federal courts require a similar showing in response to a motion for summary judgment although these matters need not be alleged in the complaint. *Turner, supra,* at 48. In the present case, plaintiffs have asserted that they did not discover the alleged fraud and negligence until consulting their present attorneys in March of 1977. Valerio deposition at 44; Chang deposition at 24. But "[i]t is not sufficient merely to allege ignorance at one time and discovery at another." *Wilson v. Wilson,* 199 Cal.App.2d 542, 545, 18 Cal.Rptr. 768, 770 (1962). Careful scrutiny by this court of all the affidavits, declarations, and depositions placed into evidence by plaintiffs has failed to reveal any specific facts indicating why plaintiffs' investigation could not have been initiated at an earlier date nor any specific facts explaining why the alleged fraud and negligence could not have been and should not have been discovered at an earlier date. Consequently, as an alternative basis for our decision, we find that the plaintiffs have not met their burden to excuse their failure to discover their causes of action within the relevant periods of limitation.

than three years before they filed this lawsuit. Both plaintiffs received their settlement checks, which amounted to approximately 17% of their investment, in the fall of 1973. Deposition of Michael Valerio, July 5, 1977, at 6; Deposition of Yung Hao Chang, July 1, 1977, at 7–8. At that time, the alleged concealment and misrepresentation of facts concerning the amount of recovery per class member was revealed to the plaintiffs and the statute of limitations began to run on all of the plaintiffs' causes of action against the attorney-defendants.[4] Since the instant complaint was filed more than three years later, summary judgment is granted in favor of the attorney-defendants.

## II. THE PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

■ The subject matter of these motions simply is inappropriate for summary judgment. The plaintiffs do not seek summary judgment on any of their claims but rather on isolated factual and legal issues. For example, they seek summary judgment on the issue of whether "Boise Cascade corporation could, in fact, have paid a sum in settlement of the *McCubbrey* action many times larger than the amount which

it did pay," and on the issue of whether "Boise Cascade Corporation, the parent, would have been held liable in *McCubbrey* for the illegal acts and omissions of its subsidiaries." Assuming arguendo the court's ability to resolve such questions, a summary judgment motion is not the proper method of raising them. "[W]hile Rule 56 'contemplates a summary judgment for a part or all of the claim made in the prayer of the claimant,' it 'does not contemplate summary judgments on evidentiary matters en route to that goal.' . . . 'Rule 56(d) does not authorize the initiation of motions the sole object of which is to adjudicate issues of fact which are not dispositive of any claim or part thereof.'" 6 Moore's Federal Practice ¶ 56.20[3.–2] (2d ed. 1948). Plaintiffs' motions for partial summary judgment therefore are denied.

SO ORDERED.

### ON MOTIONS TO DISMISS

We recited the background of this action in our opinion of April 6, 1978, thusly: "On May 21, 1973, this court entered a final order certifying, for purposes of settlement, only, the plaintiff class and approving the settlement in *McCubbrey v. Boise Cascade Home & Land Corporation,* No. C–72–0470

---

4. Plaintiff Valerio's claim that he had no knowledge of the alleged frauds until he contacted his attorneys in March of 1977, also is refuted with respect to the allegation in the complaint that the defendants concealed the "alleged liability" of the plaintiffs for lot assessments. Exhibit N to his affidavit, filed in support of his motion for a preliminary injunction, is a copy of a notice of a special meeting of the members of the Hidden Valley Lake Association to be held on March 23, 1974. According to the notice, the purpose of the meeting was to approve an increase in the annual per lot assessment from $70 to $100. Mr. Valerio attended that meeting and participated in the discussion of the lot assessments. Valerio deposition at 16–17. Mr. Valerio also stated that he received an assessment around November of 1973. *Id.* at 13.

Plaintiff Valerio did contact the Attorney General to discuss the validity of the continued assessments, but there is no reason to hold that this tolled the running of the statute of limitations as to the Attorney General. In any event, it is our opinion that the Attorney General did not incur any fiduciary duties to the *McCub-*

*brey* class by virtue of its participation in that settlement. Plaintiffs note that the Attorney General's complaint in intervention in *McCubbrey* sought relief on behalf of the individual lot purchasers. The California Supreme Court, however, recently held that a claim for restitution does not convert an action by the state into a class action and that therefore defendants in state actions are not entitled to the procedural safeguards, including notice to the class, that are required in a class action by a private party. *People v. Pacific Land Research Co.,* 20 Cal.3d 10, 141 Cal.Rptr. 20, 569 P.2d 125 (1977). Of particular relevance here is the court's recognition that the Attorney General's "role as a protector of the public may be inconsistent with the welfare of the class," for example, in settlement negotiations. *Id.* at 18 & n. 6, 141 Cal.Rptr. at 24, 569 P.2d at 129. Thus not only are any claims against the Attorney General barred by the statutes of limitations, but we also believe that the plaintiffs' allegations fail to state a claim for relief against the Attorney General and make this an alternative basis for our decision in its favor.

RFP. The instant class action was filed on May 6, 1977, by Michael Valerio and Yung Hao Chang, who were members of the *McCubbrey* class and participants in that settlement. Now, however, they seek an order vacating the *McCubbrey* judgment, 'substituting the attorneys for plaintiffs herein for those who are now of record for plaintiffs in that action and placing the matter on the court's trial calendar.' Plaintiffs' First Amended Complaint at 63. Their amended complaint also seeks $800,-000,000 in damages and $1,000,000,000 in punitive damages as well as equitable relief for alleged violations of the Sherman Act, the Clayton Act, the Robinson-Patman Act, the Securities Act of 1933, the Securities Exchange Act of 1934, and pendent claims. Included in the pendent claims are claims against many of the private attorneys who represented the *McCubbrey* class and against the Attorney General of California for fraud and negligence allegedly arising out of breaches of contractual and fiduciary duties which breaches, it is claimed, were committed in the course of achieving the *McCubbrey* settlement."

In our April 6 opinion, we held that the plaintiffs' causes of action against the attorney defendants were barred by the relevant statutes of limitation. This instant memorandum and order concerns itself with the motions to dismiss and/or for summary judgment of the remaining defendants.

## I

Beginning in 1971, a series of public and private lawsuits were filed asserting, *inter alia,* claims of fraud, breach of contract and violations of federal and state securities laws, all arising out of the sale of property in Boise Cascade recreational subdivisions. These actions were consolidated and terminated on May 21, 1973, when this court entered its final order and judgment. The history of the negotiations that culminated in the settlement is relevant to the motions currently before this court. Briefly, it is as follows:[1]

In early 1972, settlement negotiations in the public action, *People v. Boise Cascade Recreation Communities Corporation of Delaware, et al.,* Civ. No. 127902, occurred between the defendants and representatives of the Attorney General's office and the offices of the District Attorneys of Contra Costa, Nevada and Sacramento Counties. Boise's offer to establish a $10,000,000 settlement fund, which figure included both cash refunds and cancellations of indebtedness, was rejected by the Attorney General and subsequently by the private attorneys as well. Negotiations continued, however, and intensified in late 1972, partially as a result of Boise Cascade's disclosure to the public attorneys of financial difficulties it was then experiencing.

These financial difficulties in part stemmed from Boise's decision to withdraw from the recreation land business and as a consequence thereof to take a write-off against income in the pretax amount of $210 million. A related and more pressing problem facing Boise was the fact that as of 1972, it was in default on outstanding loans totaling hundreds of millions of dollars and was operating under waivers from its major institutional lenders. As a condition of restructuring Boise's debt these lenders were insisting that the financial problems, including the pending lawsuits, of Boise Cascade Home and Land Corporation, be resolved satisfactorily.[2] The fear that these lenders might carry out their threat to accelerate the debts owed them in order to assure payment before any judgments might be obtained against Boise, was a

---

1. This "history" is based upon the record in *McCubbrey,* of which we take judicial notice. *Shuttlesworth v. Birmingham,* 394 U.S. 147, 157, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Egan v. Teets,* 251 F.2d 571, 577 n. 10 (9th Cir. 1957); *cf.* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2410 at 359 (1971) ("the power of a court to take judicial notice of its own records is amply established").

2. The history of Boise's financial predicament is summarized in the affidavit of Edward W. Cleary, who at that time was Vice President and Treasurer of Boise Cascade Corporation. This affidavit was submitted to this court on May 14, 1973, and is Appendix A to this memorandum and order.

major factor in the decision of the public attorneys to agree to a tentative settlement, that provided, *inter alia,* for a settlement fund of $24,000,000. Boise then presented the same settlement to the attorneys in the six private actions, and the latter consolidated their efforts for purposes of discussing settlement. Similarly, the Attorney General and the other public attorneys presented the outlines of the settlement to all of the district attorneys of California and obtained their approval to proceed. From that point onward, both the public and private attorneys labored to work out the final agreement as well as substantiate Boise's claim of financial distress.

By mid-February of 1973, a final agreement acceptable to all parties was reached. Pursuant to negotiations, motions then were made seeking consolidation of the private actions, allowing the filing of an amended complaint, and permitting the intervention of the California Attorney General. On March 9, 1973, these motions were granted and this court conditionally approved the proposed settlement. At the same hearing, this court made a finding that the proposed notice was adequate and directed its mailing. On March 23, 1973, more than 41,000 notices were mailed to the members of the *McCubbrey* class, which ultimately totaled 44,000 people.

The fairness hearing was held on May 15, 1973, the date stated in the notice. At the hearing the factors underlining the settlement, including Boise's financial situation, were reiterated, as were the basic terms of the settlement. The court then invited and received questions from class members and attorneys regarding the effect of the settlement. In most instances the court asked counsel to comment on or explain how the settlement affected the concerns expressed. At the conclusion of the hearing, the court noted its satisfaction with the settlement, and on May 21, 1973, this court entered a final order and judgment certifying the *McCubbrey* class for the purposes of settlement only, and approving the settlement agreement, including the provision for attorneys' fees.

II

The defendants argue, *inter alia,* that the plaintiffs' claims are barred by the *McCubbrey* judgment and the releases obtained from the class. Before considering the merit of that defense, we first must deal with the plaintiffs' contentions that the notice of the proposed settlement and representation provided by counsel were constitutionally defective and that this court's approval of the settlement was obtained by fraud committed by the *McCubbrey* defendants and by the private and public attorneys who represented the plaintiffs and the State of California. If there is a basis for any of these contentions, then the defendants are entitled to summary judgment on the basis of *res judicata.*

### A. *The Adequacy of the Notice*

 Due process requires that notice in a class action "present a fair recital of the subject matter and proposed terms and given [sic] an opportunity to be heard to all class members." *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1177 (9th Cir. 1977). When this court approved the notice in 1973, we were satisfied that it met the requirements of due process and we so held. It described the pending litigation and the claims asserted therein, it explained the general terms of the proposed settlement, and it set forth the options available under it. In addition, it gave the address and phone number of the settlement committee and emphasized the committee's availability to answer any questions or give advice about any of the matters in the notice. It also noted that all of the documents concerning this action, including the amended complaint and the settlement agreement, were available for inspection at the courthouse and it further informed class members that they should feel free to consult with an attorney of their own choosing. Finally, part II of the notice set forth the date, time and location of this court's hearing to determine the fairness of the settlement, the appropriateness of a class action

and the amount of attorneys' fees to be paid to the class attorneys. In *In re Four Seasons Securities Laws Litigation,* 525 F.2d 500, 503 (10th Cir. 1975), the Tenth Circuit found a similar notice to be "far more than adequate."

The plaintiffs' contention that the *McCubbrey* notice was not adequate is based primarily on the fact that it did not state that Boise Cascade's financial predicament was a factor in the settlement. Although the defendant's financial condition is a factor for the court to weigh in considering the acceptability of a class action settlement, *Marshall, supra* at 1178, plaintiffs have cited no cases, and we have found none, wherein failure to include such information in the notice rendered it constitutionally defective. This is not to say that it would have been impermissible to include such information in the notice,[3] *see id.,* but only that due process does not require its inclusion.

Plaintiffs further claim that the notice violated due process because it did not specify the minimum recovery possible under the settlement. The notice, however, did state that "[t]he fund [$30,000,000][4] will be distributed in one of three ways, depending on the number and amount of allowed claims." It then detailed the three possible methods of distribution: (1) full restitution, including refund of all cash payments made by claimant, with return of property to Boise Home and Land; (2) partial restitution, including refund of at least 60% of all cash payments made by claimant before filing his claim and all cash payments made by claimant after filing his claim; (3) partial restitution, including a cash refund of a percentage of all payments made with no return of property to Boise Home and Land. A similar argument that due process requires more than this was rejected in *Marshall, supra.* There the court, per Judge Carter, stated,

> They argue that the notice did not fairly apprise class members of their positions because it did not specify their potential recovery. It is obvious, however, that this was a matter of conjecture since it was unknown how many class members would opt out or submit claims. The aggregate amount available to all claimants was specified and the formula for determining one's recovery was given. Nothing more specific is needed. *See Cannon v. Texas Gulf Sulphur,* 55 F.R.D. 308, 313 n. 2 (S.D.N.Y.1972) (approval of the TGS settlement).

*Id.* at 1177–78.

The balance of plaintiffs' objections to the adequacy of the notice are refuted by the record and/or are so trivial that they could never be the basis for setting aside the *McCubbrey* judgment.[5] We thus find that *McCubbrey* notice was adequate.

---

3. We, however, think that the most likely result would have been to induce more people to opt in rather than, as plaintiffs apparently assume, opt out of the class action settlement.

4. The fund was equal to $24,000,000 "plus (a) 24% of the aggregate original retail purchase prices of the property owned by all owners, plus (b) 12% of the amount, if any, by which $22,500,000 is exceeded by the aggregate of all claimants' note balances as of the computation date." Settlement Agreement ¶ G–2. As explained at the May 15, hearing, "The fund [$24,000,000] grows to the extent that Boise is obtaining land back. So that within the concept of net asset drain, the fund probably ranges in the vicinity of $30,000,000. That is an IRS estimate." Hearing May 15, 1973 (RT 22).

5. For example, plaintiffs contend that the notice violated due process because it "implied that there was a reasonable likelihood that a claimant might receive a recovery in the range of 60%–100% of his investment, when in fact there was no such likelihood and the attorneys knew it." As stated above, the notice set forth the possible methods of distribution and the circumstances that would bring each method into play. It also stated, twice, that "method Three will NOT be used UNLESS the number and combined amounts of all claims are too high to permit use of Method One of Method Two." This was merely a statement of fact, the purpose of which was to point out that while claimants would keep their property under method number three that method would be used only if methods one and two were not. *Cf. In re Gypsum Antitrust Cases,* 565 F.2d 1123, 1125 n. 1 (9th Cir. 1977).

Plaintiffs also argue that the notice was defective because it "failed to disclose that the Boise defendants had agreed to pay $2 million in attorneys' fees (not 'up to' $2 million as represented in the notice, but *exactly* $2 mil-

In this posture, the instant case is strikingly similar to *In re Four Seasons, supra.* There the appellant argued that the notice was inadequate because it failed to inform him of criminal investigations that had been made of some of the corporate officer defendants. As noted above, the Tenth Circuit found the notice adequate despite this omission. The court further stated,

> The appellant was well aware through the notice that he could make further investigation of the basis for and background of the settlement. The court files were expressly suggested to him, the hearing date was stated, and the possibility of questions to his counsel was indicated. *Appellant however made no effort to utilize the suggested sources, and cannot now be heard to complain that he did not know what they would have revealed.* No one withheld information from appellant. Instead his lack of knowledge came about from his own failure to inform himself as to a matter he now complains was unknown to him. Thus, if the notice met the due process requirements, and we hold that it did; and if it met the standards in the rule, and again it did; as to anything beyond that by way of facts the appellant had the duty to ascertain on his own in decid-

ing to opt in or out, or for any other reason.

525 F.2d at 503 (emphasis added).

Similarly, plaintiffs' ignorance of Boise's claims of financial distress is attributable to their own failure to investigate, not to the inadequacy of the notice. It would be an understatement to say that the plaintiffs' scrutiny of the *McCubbrey* settlement proceedings was far less in 1973 than it is now that they are seeking a determination that the judgment is void as to all 44,000 members of that class. Both of the plaintiffs received and read the notice of the proposed settlement. Plaintiff Chang, however, made no inquiries of the settlement committee nor did he consult an attorney regarding any of the matters contained in the notice. Plaintiff Valerio likewise did not consult an attorney, although he did call the settlement committee to ask how to fill out the claim form. He also asked how much money he would receive by participating in the settlement and was told that it depended upon how many claims came in.[6] Neither of the plaintiffs availed themselves of the opportunity to examine the documents on file with the court, nor did they appear at the fairness hearing although both resided in the Bay Area.[7] In sum, plaintiffs did little more after receiving the notice than to file their claims for restitution and to

---

lion), plus $22,500 which they represented in the settlement agreement as being part of the costs of administration, but which, in fact, were additional attorneys' fees." Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motions for Summary Judgment at 9 (Aug. 10, 1977) [hereinafter "Plaintiffs' Memorandum of August 10"] (emphasis in original). Both the notice and the Settlement Agreement made it clear that the $2,000,000 was intended to cover costs *and* attorneys' fees. As for the dispute over the $22,500 it is merely a question of characterization that is of no constitutional significance. (See our discussion of this matter at the hearing of July 15, 1977 (RT 69–97, esp. pp. 96–97).

6. Deposition of Michael Valerio at 26–27.

7. Plaintiffs contend that their opportunity to participate would not have been very meaningful because several relevant documents, e. g., the Cleary affidavit, were not filed until shortly before the hearing; hence they would not have had time to engage in meaningful discovery.

Plaintiffs, however, cannot be heard to complain that they had no opportunity to develop a record when they never made any attempt to do so. *Compare Girsh v. Jepson,* 521 F.2d 153, 157–58 (3rd Cir. 1975) (objector "made repeated efforts, through timely filed motions, to obtain answers to her interrogatories and to continue the date of the settlement hearing. . . . she did every thing within her power to prepare for the settlement hearing."), *with, Kohn v. American Metal Climax, Inc.,* 489 F.2d 262, 264 (3rd Cir. 1973) (distinguished in *Girsh,* 521 F.2d at 158 n. 9) (contentions that procedural incidents of hearing were inadequate rejected where "appellants did not seek discovery prior to the hearing, or seasonably request additional time to prepare for examination of witnesses. . . . Moreover, the appellants did not utilize the opportunity prior to the hearing to marshall any evidence indicating that the settlement should not receive court approval or to analyze in any way the vast amount of evidence already in the record . . . ."

cash the claim checks that they subsequently received in the fall of 1973.[8]

### B. *The Adequacy of Representation*

Plaintiffs contend that many of the same acts and omissions that rendered the notice constitutionally defective also demonstrate the inadequacy of the representation given the class. In light of our determination that the notice satisfied due process it follows that, under the circumstances of this case, there was adequate representation.

Our conclusion is further warranted by the fact that the *McCubbrey* class received notice of the suit, of the proposed settlement and its terms, and of the opportunity to opt out, all at the same time. In similar circumstances, the Tenth Circuit has held that "due process may be satisfied by notice alone and that, where due process is thus satisfied, adequacy of representation need not be shown as a matter of constitutional necessity." *In re Four Seasons Securities Laws Litigation,* 502 F.2d 834, 843 (10th Cir.), *cert. denied,* 419 U.S. 1034, 95 S.Ct. 516, 42 L.Ed.2d 309 (1974). While this holding has been criticized as a general proposition, *see* Comment, The *Importance of Being Adequate: Due Process Requirements in Class Actions Under Federal Rule 23,* 123 U.Pa.L.Rev. 1217, 1219 (1975), even that critic agreed that the Tenth Circuit's holding was proper under the circumstances of that case. *Id.* at 1219 & 1223. And, in *Marshall, supra,* the Ninth Circuit took a position quite similar to that of the Tenth Circuit. In *Marshall,* the appellants argued that "adequate representation by a single lead counsel was impossible because of . . . intra-class conflicts." 550 F.2d at 1176. The court found that the conflict was not of the type that would render maintenance of the class action an abuse of discretion and it

additionally noted that because the class action was brought under rule 23(b)(3), [a]ppellants had the right and opportunity to opt out in this action. They chose not to. We believe that they should not now be allowed to play the role of spoilers for a class of more than 31,000 people when they could have chosen not to be bound by the settlement. *See generally Developments in the Law—Class Actions,* 89 Harv.L.Rev. 1318, 1485–89 (1976) (hereinafter cited as Developments).

This conclusion is reinforced in this case by the fact that all class members were given the right to opt out *after* being apprised of the terms of the settlement. Appellants were not forced into a position of having to predict whether their interests would be adequately represented. They could determine whether there had been adequate representation of their interests by reviewing the terms of the settlement. If they were dissatisfied, they could opt out of the class. This opportunity to opt out after knowing the terms of a proposed settlement is unusual in the class action context and serves to protect the interests of class members. *See Ace Heating & Plumbing Co. v. Crane Co.,* 453 F.2d 30, 33 (3 Cir. 1971). Appellants' rights were fully protected by this right to opt out. We therefore hold that they were adequately represented.

*Id.* (emphasis in original).

The plaintiffs' reliance on *Mandujano v. Basic Vegetable Products, Inc.,* 541 F.2d 832 (9th Cir. 1976), is misplaced. *Mandujano's* discussion of the attorney-client relationship in class actions was in the context of that court's development of "*Procedures To Protect Dissidents In Title VII Class Actions.*" *Id.* at 834 (emphasis in original). Even in that context, i. e., rule 23(b)(2) class

---

8. Indeed, prior to filing the instant lawsuit, the plaintiffs' major concern with any matter touched upon by the lawsuit, apart from their unhappiness over the amount of their claim checks, was their continuing liability for lot assessments. Because of their refusal to pay these assessments, the plaintiffs have been and are the defendants in several small claims actions filed by some of the defendants herein:

Pine Mountain Lake Association, Hidden Valley Lake Association and Stonehouse Mutual Water Company. Following the filing of those actions, the plaintiffs consulted their present counsel and subsequently filed this lawsuit naming 28 defendants and seeking $1.8 billion in general and punitive damages, as well as an order setting aside the *McCubbrey* judgment.

actions where the opportunity to opt out does not exist, we doubt that *Mandujano* stands for the proposition urged by plaintiffs: that the attorney-client relationship in a class action is identical to that in a nonclass action.

Such a contention is even more dubious when applied to rule 23(b)(3) class actions like *McCubbrey*. First, as noted by Judge Kennedy in his concurring opinion in *Marshall,*

> It is not clear that *Mandujano,* which sets forth precise procedures for district courts to follow in class actions brought under Fed.R.Civ.P. 23(b)(2), is applicable to a class action like the one here, brought under rule 23(b)(3).

550 F.2d at 1179. Second, while, despite Judge Kennedy's caution, the *Marshall* majority did rely on *Mandujano* in reaching its conclusion that the trial court did not abuse its discretion in approving the settlement presented, it is significant that the court did not even mention *Mandujano* in its analysis of the adequacy of representation. Instead, as alternative bases for its conclusion that the representation was adequate, the court emphasized the facts that the objectors had the opportunity to opt out of the class and that they were in the unique position of being able to exercise this option after having been apprised of the terms of the settlement. These same considerations, along with those noted above, warrant our conclusion that the representation provided the *McCubbrey* class was in fact adequate.[9]

## C. Fraud on the Court

 In their continuing efforts to avoid the *res judicata* effect of the *McCubbrey* judgment, the plaintiffs have made the very serious charge that the *McCubbrey* defendants, the plaintiffs' attorneys therein and the Attorney General committed a fraud on this court.[10]

### 1. The Attorney Defendants

 The charge against the attorneys is extremely troublesome: not because it has any merit, but because it so obviously does not. It is difficult enough to believe that more than 20 respected members of the bar representing clients in six separate actions would conspire to defraud their clients and this court. The fact that the Attorney General and several district attorneys actively participated in the *McCubbrey* negotiations and settlement on behalf of all the district attorneys of California and the people of this state only serves to heighten our incredulity. Analysis of the allegations made

---

**9.** If anything, the equities of the plaintiffs' position here are less than those of the appellants in *Marshall.* Not only did the plaintiffs here choose not to opt out of the settlement, but they did not appear at the fairness hearing, or appeal the court's approval of the *McCubbrey* settlement. And it was almost four full years after approval of the settlement that they filed this action seeking to play the role of spoilers for a class of approximately 44,000 people.

**10.** Plaintiffs' memoranda of May 9, 1978, and May 10, 1978, evidence considerable confusion regarding the effect our earlier opinion had on this issue. Thus in their May 9 memorandum plaintiffs state,

> Certainly, it is true that by granting the motion of the attorney defendants for summary judgment on the ground which is set forth in its opinion, this court necessarily has held that at least insofar as the attorney defendants are concerned, there *is* a period of limitation beyond which actions for fraud on the court are barred.

(emphasis in original). Such a holding was neither expressed or implied in our April 6 order, and on May 10, plaintiffs quoted this same passage of their previous day's memorandum and correctly noted, "However, this court's written opinion which was filed herein on April 6 demonstrates that this is not true."

Plaintiffs, however, are still confused about the scope of our April 6 opinion. It was not, as they contend, error to grant the attorney-defendants' motions for summary judgment while plaintiffs' motion for leave to amend to allege fraud on the court was pending. Our earlier opinion held only that the statute of limitations had run on the plaintiffs' causes of action against the attorney-defendants for malpractice and fraud. Although the claims are factually intertwined, the mere fact that we discuss the issue of fraud on the court in this order is conclusive evidence that the contention was not rejected in our earlier opinion.

There is no statute of limitations for fraud on the court. And jurisdiction exists to consider such a claim even if there are no adversary parties then present before the court. See C. Wright & A. Miller, Federal Practice and Procedure § 2870 at 250 (1973).

against the attorneys confirms our belief that this charge of fraud on the court was unjustifiably and recklessly made.

The plaintiffs contend that the attorney defendants committed a fraud on the court in that, *inter alia,* they

(1) did not advise the court of their assessment of the merits of the case or of the actual damages sustained; (2) did not advise the court that the notice to the class contained no mention of the fact that the sum which was being proposed for settlement had not been arrived at upon the basis of any evaluation of the merits of the case or the damages sustained, but rather upon the claim of Boise that if that sum were not accepted, it would go bankrupt; (3) did not advise the court that in accepting this basis for the settlement, they had relied upon Boise's own presentation of its financial condition; (4) did not advise the court that they had pledged to Boise to keep secret from their own clients the facts concerning this basis for the settlement; (5) did not advise the court that there were unexplored avenues through which to obtain more compensation for the class on a basis which would be contingent upon Boise's return to financial health; (6) did not advise the court that documents which were pertinent to the settlement had been filed as late as 8:36 a. m. on the morning of the fairness hearing; (7) did not advise the court that they had agreed with Boise upon their attorneys' fees prior to the fairness hearing, but had not advised the class of that agreement or of Boise's pledge to support their fee application; (8) represented to the court as being costs what was, in fact, an additional attorney's fee.[11]

Assuming arguendo the truth of these and similar allegations, none of them prove fraud on the court.

While the precise parameters of "fraud on the court" remain undefined, that phrase is "[to] be read narrowly, in the interest of preserving the finality of judgments, which is an important legal and social interest." *Toscano v. Commissioner of Internal Revenue,* 441 F.2d 930, 934 (9th Cir. 1971). Based largely upon the leading case of *Hazel-Atlas Co. v. Hartford-Empire Co.,* 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), Professor Moore has suggested the following definition, which also is that suggested by the plaintiffs here:

"Fraud upon the court" should . . . embrace only the species of fraud which does or attempts to defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.

7 Moore's Federal Practice ¶ 60.33 at 512–13 (2d ed. 1970). In summarizing the types of conduct that do or do not constitute fraud on the court, the court in *United States .v. International Telephone & Telegraph,* 349 F.Supp. 22 (D.Conn.1972), *aff'd sub nom. Nader v. United States,* 410 U.S. 919, 93 S.Ct. 1363, 35 L.Ed.2d 582 (1973), stated,

Generally speaking, only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court. See *Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); *Root Refin. Co. v. Universal Oil Products, supra,* 3 Cir., 169 F.2d 514; 7 J. W. Moore, Federal Practice, para. 60.33 at 510–11. *Less egregious misconduct, such as nondisclosure to the court of facts allegedly pertinent to the matter before it, will not ordinarily rise to the level of fraud on the court.* See *Kupferman v. Consolidated Research & Mfg. Co., supra,* 2 Cir., 459 F.2d 1072; see also *England v. Doyle,* 281 F.2d 304, 310 (9th Cir. 1960).

*Id.* at 29 (emphasis added). *See also Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1338 (5th Cir. 1978) (quoting *IT&T*).

---

11. Plaintiffs' Memorandum of Points and Authorities in Opposition to Motions to Dismiss and Reply Points and Authorities in Support of Preliminary Injunction at 4–5 (July 12, 1977) [hereinafter "Plaintiffs' Memorandum of July 12"].

We seriously doubt that even the most liberal definition of fraud on the court would encompass the acts complained of, and when that phrase is given the narrow interpretation that our interest in finality of judgments requires, it is clear that even assuming the truth of all of these allegations, they do not establish fraud on the court.

■ Plaintiffs also claim that the failure of the notice to discuss the financial condition of the Boise defendants establishes not only its constitutional inadequacy and fraud on the class, but also fraud on the court. Unless it is plaintiffs' position that this court somehow committed fraud by not insisting on the inclusion of that information in the notice, we do not understand how this omission established fraud on the court since we were fully apprised of Boise's claims of financial distress. In any event, because we have found that the notice satisfied the dictates of due process, we reject all charges stemming from the alleged inadequacy of the notice as a basis for a finding of fraud on this court.

■ In contrast, the allegation that the class attorneys misrepresented Boise Cascade's financial condition, if proven, would establish that a fraud on the court had been committed. As noted earlier in this memorandum, the financial condition of the defendant is one of the factors to be considered in assessing the adequacy of a proposed class action settlement. Thus, deliberate misrepresentations of Boise Cascade's financial condition would constitute an "unconscionable plan or scheme which is designed to improperly influence the court in its decision." *England v. Doyle*, 281 F.2d 304, 309 (9th Cir. 1960). Our review of the allegations concerning the conduct of the class attorneys, however, reveals that the charge against them is not really that they committed fraud upon the court but rather that they exercised poor judgment in recommending approval of the settlement.

The plaintiffs state, for example,

Furthermore, although the attorneys represented to this court that the ultimate justification for the proposed settlement was Boise's inability to pay more, the attorneys could not reasonably have believed this to be true, and so a further fraud was committed on the court. This appears, among other places, in the transcript of the fairness hearing itself. Thus, at pages 10–12 thereof, Jay Linderman, Deputy Attorney General, stated, in substance, that (1) in assessing the financial condition of Boise, the attorneys for the class had relied upon the representations of Boise officials; and (2) the final figure for restitution was raised from $10,000,000 to $24,000,000 during a meeting in London of a few hours duration in which only two attorneys and no accountants participated. This is shocking. It is absurd to settle a case for a figure in the tens of millions of dollars upon the basis, not that it is fair but, that it is all that the defendants can pay when the justification therefor is the unsworn statements of the defendants who, to make matters worse, are in the position of having to pay any money at all only because of a deliberate program of falsehood.

Even assuming that the defendants might not have been able to pay more cash right there and then, it is apparent to all, even without the benefit of sophisticated accountants, that there are a number of devices by which the class could have been placed in a position to obtain additional compensation if Boise prospered, which it did. These devices include: (1) notes; (2) notes payable only when earnings reach a certain level; (3) subordinated notes; (4) subordinated debentures; (5) preferred stock; and (6) equity stock.[12]

Assuming the validity of plaintiffs' contention that more advantageous alternatives to the settlement proposal should have been "apparent to all," then it follows that this court is as guilty of exercising poor judgment as are the attorney defendants. Most assuredly, however, this court is not

---

12. Plaintiffs' Memorandum of July 12, at 7–8.

thereby guilty of fraud and neither are they.

### 2. *Boise Cascade*[13]

The plaintiffs make a variety of allegations that they contend establish fraud on the court.[14] But, as in the case of the attorney defendants, only the charge that Boise affirmatively misrepresented its financial condition could support a finding of fraud on the court; and again as with the attorney defendants, there is simply no basis for such a charge.

The basic elements of Boise's "financial predicament" were outlined in part I of this order. In 1973, no one could be sure what the consequences of failing to settle *McCubbrey* would have been. The possibility existed, however, that Boise's lenders would have accelerated the debts owed to them and that Boise might have been forced into bankruptcy or reorganization, if not immediately then at some point in the future if the pending actions were prosecuted successfully. Plaintiffs may dispute the wisdom of the inferences and the decisions that were based upon the information provided by Boise, but they have given us no reason to believe that that information was false.

The plaintiffs' claim that Boise had misrepresented its financial condition to this court was not set forth in plaintiffs' complaint, but rather was made for the first time in response to these motions to dismiss. At that time plaintiffs had no basis for challenging the veracity of Boise's representations other than their disbelief. Subsequently, plaintiffs sought to buttress their claims with the submission of the affidavits of Lee P. Cordon, a certified public accountant, and William Kelly, an attorney specializing in matters relating to insolvency and bankruptcy.

**13.** We have not detected any specific allegation that Boise Cascade's attorneys were a party to the alleged fraud on the court. Thus, there is some question whether Boise's conduct could under any circumstances rise above fraud *inter partes. See, e. g., United States v. International Telephone & Telegraph, supra,* 349 F.Supp. at 29; *Lockwood v. Bowles,* 46 F.R.D. 625, 632 (D.D.C.1969) ("we believe the better view to be that where the court or its officers are not involved, there is no fraud on the court within the meaning of Rule 60(b)."). Fraud on the court could establish fraud *inter partes,* but the reverse is not necessarily true and fraud *inter partes* unlike fraud on the court is governed by the equitable doctrine of laches, *see, e. g., Lockwood, supra* at 629, which would be a bar here: As stated in our April 6, opinion, plaintiffs had actual knowledge of at least one of the major frauds alleged to have been committed on the class as of the date they received their settlement checks in the fall of 1973. And there are good arguments that had plaintiffs exercised due diligence their claims could have been raised even earlier. The Boise defendants clearly have been prejudiced by this delay not only because they proceeded to pay out large sums of money that as a practical matter probably are unrecoverable, but also because of the likely unavailability of many of the witnesses whose testimony would be relevant to the merits of the *McCubbrey* action.

Our circuit, however, has rejected any mechanical approach to the question of what constitutes fraud on the court as opposed to fraud *inter partes. Toscano, supra,* 441 F.2d at 933–35. Thus, a party's conduct may be sufficiently egregious, though not involving an officer of the court, to constitute fraud on the court. We believe that affirmative misrepresentations of financial condition in order to obtain court approval of a class action settlement would establish fraud on the court even if Boise's attorneys were completely innocent of any wrongdoing.

But, as stated above, we find no basis for the claim that Boise or its attorneys made any misrepresentations that constitute a fraud on this court.

**14.** Plaintiffs' also allege that Boise did not intend to and has not carried out its promises to complete improvements and continue administration and maintenance of the projects. To the extent that this is true, plaintiffs' remedy is set forth in the settlement agreement which grants the Attorney General enforcement powers. There certainly is no fraud on the court here. Plaintiffs' further contention that the attorney-defendants and Boise misrepresented the nature of its obligations, i. e., they made illusory promises by stating that they would guarantee completion of the various projects when in fact some of them already were bonded, not only does not state a claim of fraud on the court, but it appears to be refuted by the record in *McCubbrey.* At the May 15 hearing, the Attorney General stated,

Much of these amounts [costs of improvements] are bonded to guarantee completion; and, to the extent that they are not bonded, the completion has been guaranteed by Boise Cascade Corporation, . . . .

Hearing at 17.

Based upon "understandings" regarding Boise's assertions of possible bankruptcy, "society's reluctance to allow large companies to be liquidated," his analysis of the Cleary affidavit,[15] and Boise Cascade's 1972 annual report, Mr. Cordon concluded,

(1) the likelihood that Boise would have become bankrupt if there had been no settlement of the *McCubbrey* action at the time when that settlement actually occurred is nil;

(2) Boise could have paid an additional $100 million in settlement over and above what it actually committed itself to pay at that time;

(3) Boise could have paid the face value of the outstanding claims, which I am advised was approximately $350 million, without having to suffer liquidation;

(4) Boise ultimately would have been able to pay a judgment of as much as $500 million to $1 billion, although this obviously would have been a devastating blow which it could not have absorbed immediately.

Mr. Cordon's analysis is seriously flawed in at least two respects. First, he ignores his own caveat that

an analysis of financial statements cannot fully indicate the ability of a company to withstand an adverse event. In order adequately to investigate the ability of Boise to pay a settlement or a judgment, it would have been necessary to secure the present value of its assets as opposed to the book value which reflected on its financial statements.

Second, Mr. Cordon's opinion of Boise's ability to withstand a judgment substantially in excess of that provided for in the *McCubbrey* settlement appears to be based upon Boise's financial condition after its debts were restructured thus ignoring the connection between the restructuring and the settlement.

In marked contrast to Mr. Cordon's opinion is that of Mr. Kelly, who was presented with the same documents given to Mr. Cordon, as well as with Boise Cascade's pro-

spectus filed with the SEC on May 7, 1970, and the corporation's registration statement.

Assuming that the documents described above accurately portray the financial condition of the entities which are described therein at the time to which they refer, I cannot advise you whether or not Boise would have filed a proceeding under the Bankruptcy Act in the absence of the settlement which, in fact, occurred. It is not possible for me to calculate the minimum amount of a settlement or judgment which could be described as sufficiently large to result in the probable bankruptcy of Boise without consultations with qualified accountants and other experts and a far more extensive investigation than I have thus far had time to perform. The same is true with regard to reaching any conclusion concerning the probable effect of a Boise bankruptcy or insolvency proceeding upon members of the class. Such consultations and investigation also would have been necessary to make these determinations at the time of the settlement. Initially, a complete review of each of the Boise entities and analysis of its assets, as well as its liabilities (particularly secured liabilities) would have been required. I am assuming that the possibility exists that one, some or all of the entities would have filed proceedings under some provision of the Bankruptcy Act. Analysis would have been required with respect to each entity relative to each of the proceedings available under the Act; assuming that each entity is a corporation, these include straight bankruptcy and proceedings under Chapters X and XI of the Act.

In order to make such an analysis, it would be and would have been necessary to be completely familiar with the interrelation between each of the entities. *As secured financing is a major factor with regard to each of the entities, review of the loan documents and the amendments thereto would have been required.*

**15.** See Appendix A.

As I understand it, the question of the likelihood that Boise would have filed a proceeding under the Act would have been influenced substantially by the probable conduct of one or more of the major secured lenders in the event that there had been a large settlement with, or judgment in favor of, the class. Even with a complete knowledge of the structure of the companies, their assets, liabilities and relative circumstances, and even with a knowledge of the nature and status of the secured financing arrangements, neither I nor any insolvency specialist known to me would be qualified to predict the probable action which would have been taken by such secured lenders, and their own statements in these regards could not properly have been taken at face value. In order accurately to make such predictions, one would require consultation with disinterested persons having high-level banking experience and preferably persons with considerable familiarity with the history of the Boise financing problems. (Emphasis added.)

Mr. Kelly's opinion was concurred in by Irving J. Sulmeyer, a bankruptcy specialist who stated, in response to plaintiffs' questions,

We tend to agree with the affidavit of William Kelly above referred to, that it is impossible to state with any reasonable assurance from the documents submitted to us, whether or not a voluntary or involuntary proceeding under the Bankruptcy Act with respect to Boise Cascade Corporation and/or its wholly-owned subsidiary Boise Cascade Home and Land was imminent at the time the District Court made its preliminary order of approval in March of 1973, or its final order of approval in May of 1973. In our opinion, any conclusion as to the imminence of a proceeding under the Bankruptcy Act by or against the Boise Cascade entities at that period of time in 1973, would be purely speculative.

■ Neither these affidavits nor the newspaper article [16] submitted by plaintiffs provide any evidence that a fraud was committed upon this court. With respect to the attorney defendants, the affidavits may be of some relevance to the plaintiffs' claim that the attorney defendants' evaluation of the significance of Boise's financial condition was faulty. As indicated above, however, therein lies no basis for a claim of fraud on the court. With respect to Boise's conduct, the Kelly affidavit suggests the possibility that Boise's lenders in fact might not have accelerated the payments owed them and hence Boise's fears may have been somewhat exaggerated. That possibility does not contradict any of the representations made to the attorney defendants or this court, and it is hardly unusual for parties and their attorneys to characterize the facts in the manner most advantageous to their position. But as long as those positions are taken in good faith, and the underlying facts are not misstated, that is advocacy, not fraud on the court.

■ Contrary to plaintiffs' assertions, the fact that they have not had an opportunity for discovery [17] to find "further" evi-

16. Exhibit A to the third affidavit of Ernest M. Thayer, plaintiffs' counsel, is a xerox copy of an article that purportedly appeared in the San Francisco Chronicle at or near the time of the *McCubbrey* settlement. Rather than attempt to summarize its substance, a copy in substantially the same condition as that provided the court is attached as appendix B to this opinion. We do note that part of the article between the end of the first column and the beginning of the second column appears to be missing, and that this missing portion appears to be a discussion of the role the loan agreements played in the *McCubbrey* settlement.

17. This court imposed a ban on discovery pending hearing and resolution of Boise Cascade's motion to dismiss or alternatively for summary judgment based on *res judicata*. As the Ninth Circuit has noted,

The Supreme Court seems now to be aware of a fact long known to practitioners. The liberal discovery rules of the Federal Rules of Civil Procedure offer opportunities for harassment, abuse, and vexatious imposition of expense that can make the mere pendency of a complex lawsuit so burdensome to defendants as to force them to buy their peace regardless of the merits of the case. The decision in *Blue Chip Stamps v. Manor Drug Stores,* 1975, 421 U.S. 723, 95 S.Ct. 1917, 44

dence of fraud on the court does not preclude our rejection of their charges.

 It is well established that one who alleges fraud of any kind must have good reason to believe that a fraud has occurred. This principle is incorporated in rule 9 of the Federal Rules of Civil Procedure. As an exception to the notice pleading standards that otherwise govern the adequacy of complaints in the federal courts, rule 9 requires that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." The possibility that discovery will provide evidence of fraud is no defense to a motion to dismiss for failure to comply with the strictures of rule 9. Thus, for example, the district court in *Rich v. Touche Ross & Co.,* 68 F.R.D. 243 (S.D.N.Y.1975), denied plaintiff's request that a ruling on defendant's motion to dismiss be delayed pending discovery:

> Such tactic is impermissible. "A complaint alleging fraud should be filed only after a wrong is reasonably believed to have occurred; it should serve to seek

L.Ed.2d 539, an action based on § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the SEC, recognizes this fact and is to be a [sic] considerable extent based upon it:
*Franchise Realty Interstate Corporation v. San Francisco Local Joint Executive Board of Culinary Workers,* 542 F.2d 1076, 1083 (9th Cir. 1976). Summary judgment is rarely granted, particularly in an antitrust case, without an opportunity for full discovery by both parties. But it may be appropriate even in the absence of discovery where, as here, the defenses raised, *res judicata* and statute of limitations, do not go to the merits of the action. *Willmar Poultry Co. v. Morton-Norwich Products, Inc.,* 520 F.2d 289, 293 (8th Cir. 1975) (citing cases), *cert. denied,* 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976).

We also imposed restrictions on communications between plaintiffs' counsel and members of the proposed class, which has not been certified. This action was taken after plaintiffs' counsel had mailed thousands of letters to Pine Mountain and Hidden Valley Lake property owners. The letter referred to the uncertified action as a class action brought on behalf of the property owners; it made reference to the *McCubbrey* settlement and its alleged inadequacies; it stated that the relief being sought included an order that would eliminate the assessments being levied upon property and

redress for a wrong, not to find one." *Segal v. Gordon, supra,* 467 F.2d 602 at 607–08 [2d Cir. 1972]. See also, *Segan v. Dreyfus Corporation,* 513 F.2d 695 (2d Cir. 1975); *Lewis v. Varnes,* 368 F.Supp. 45 (S.D.N.Y.1974).

*Id.* at 247. *Accord, Clinton Hudson & Sons v. Lehigh Valley Cooperative Farms, Inc.,* 73 F.R.D. 420, 424 (E.D.Pa.1977). When the charge is fraud on the court, our interest in finality of judgments makes it all the more imperative that such a charge not be countenanced when it is based on suspicion alone.

In *H. K. Porter Co. v. Goodyear Tire & Rubber Co.,* 536 F.2d 1115 (6th Cir. 1976), the Sixth Circuit dealt with the precise question posed by the plaintiffs in this case, i. e., the appropriateness of postjudgment discovery. In the course of its analysis, the court first noted the paucity of authority concerning this question. We too have found few cases other than *Porter* that are closely on point. But this is significant in itself because it underscores the fact that a

would assure a market for sale of those lots. The letters ended with a request that the recipient fill out the enclosed questionnaire, "[i]n order to prevent the defendants from continuing to levy and collect assessments, and to halt the flood of small claims court lawsuits which they have filed in this connection, . . ." The questionnaire dealt primarily with representations made at the time of sale: issues that clearly were covered by the *McCubbrey* settlement.

Accompanying the letters to the Hidden Valley Lake lot owners was a letter from the secretary-treasurer of the Lot Owners Relief Effort, in which recipients were urged to "assist us all in the new federal court class action concerning Hidden Valley Lake which has just been filed," by filling out the questionnaire sent by plaintiffs' counsel. The letter also stated

> It now appears that there may be a legal solution for those of us who purchased property, awaiting further development of the subdivision, and have found ourselves unable, to sell the property, while at the same time we are being burdened, not only with these high assessments, but also with small claims court suits for their collection.

In October, 1977, after full consideration of the First Amendment implications, we reaffirmed our earlier decision restricting communications and we also continued the stay of discovery.

litigant alleging fraud on the court usually comes into court with evidence obtained subsequent to the entry of judgment. The question then is whether that evidence demonstrates fraud on the court.

In marked contrast, the charge of fraud on the court in this case was made for the first time in response to motions to dismiss. As we have shown, plaintiffs have no evidence to support the few allegations that might possibly rise to the level of fraud on the court. Instead, apparently operating under the old adage that the best defense is a good offense, they have demanded that the *defendants prove that there was no fraud on the court.*

Alternatively, plaintiffs demand that this court provide them the means to substantiate their claim that such fraud occurred. In *Porter, supra,* the district court refused to allow plaintiffs to engage in such discovery absent some evidence that a fraud had indeed been committed. In affirming that decision, the Sixth Circuit stated,

> we must recognize that a request for discovery for the purpose of attacking a final judgment involves considerations not present in pursuing discovery in a pending action prior to a judgment. Primary among these considerations is the public interest of the judiciary in protecting the finality of judgments.

*Id.* at 1118. This "primary" consideration is even more pressing in a class action context where "[f]inality of judgments is especially important." Comment, *supra* at 1247.

Had the plaintiffs presented some evidence of fraud on the court, we think these considerations might be sufficiently outweighed by the countervailing public interest in "preservation of the integrity of the judicial process," *Hazel-Atlas, supra,* 322 U.S. at 246, 64 S.Ct. at 1001, to warrant withholding our decision pending further discovery. That, however, is not the case, as plaintiffs here, like the plaintiffs in *Porter,* presented no evidence of fraud on the court. As the district court judge in *Porter*

stated, " 'No party to a proceeding may begin a new round of procedural attacks on a judgment without demonstrating good cause for those attacks.' " *Porter, supra* at 1121. *Cf. Lockwood v. Bowles,* 46 F.R.D. 625, 633 (D.D.C.1969) ("Except in extraordinary circumstances such as those truly contemplated by the term 'fraud upon the court' in rule 60(b), the law favors an end to lawsuits rather than a free reopening and retrial of them.").

As the court that presided over the *McCubbrey* settlement, we were in a position to study and consider closely the conduct of the attorneys and of the litigants in that action. We remain convinced that the representation provided there was of the highest quality and that the *McCubbrey* settlement was

> an extraordinary imaginative and resourceful resolution of a very complex and protracted matter and series of matters that have confronted many courts in the State and two federal courts. It has all of the ingredients of a settlement that neither side can be totally happy with, entirely happy with the results. It would not be a settlement if it were otherwise.

Hearing May 15, 1973 (RT 80–81).

### III

We turn now to the merits of these motions to dismiss and/or for summary judgment, with particular emphasis on the *res judicata* defense raised by the defendants.

The more detailed analysis that follows supports our conclusion that this action is in the main barred by the *McCubbrey* judgment as to all defendants except Hidden Valley Lake Properties, Inc. and the directors of the Stonehouse Mutual Water Company.[18] (The latter were not defendants in the *McCubbrey* action.) Plaintiffs' own complaint seems to concede that the heart of the current lawsuit is based upon the same conduct that gave rise to the actions that were settled in 1973: paragraph 141 of count XVI, which alleges

---

18. The complaint, however, contains no charging allegations against the directors who "are sued in their corporate capacity." Thus, given

the failure of the claims against Stonehouse, judgment in favor of its directors also is appropriate.

breach of the settlement agreement, states in relevant part,

In fact, said defendants [the Boise defendants, Hidden Valley Lake Association, Stonehouse Mutual Water Company and Pine Mountain Lake Association] continued and intended to continue in their previously existing course of illegal and tortious conduct and, specifically, defendants intended to and did act as follows:

. . . . .

(c) defendants did not cease their illegal actions. [sic] but, to the contrary, continued them as is alleged in Counts I through XV above.

The relief sought for this allegedly illegal conduct is basically the same as the *McCubbrey* prayer, which, *inter alia,* asked for rescission of the land sales contracts, damages where appropriate, rescission of obligations to pay assessments levied by the homeowners' associations and the water company, and discharge of the liens that those defendants had obtained.

■■■■■ Many of the legal theories and grounds for recovery underlying the plaintiffs' claim for relief differ from those set forth in *McCubbrey.* That, however, does not preclude application of the doctrine of *res judicata,* for as stated in *Mirin v. Nevada ex rel., Public Service Commission,* 547 F.2d 91, 94 (9th Cir. 1976), *cert. denied,* 432 U.S. 906, 97 S.Ct. 2952, 53 L.Ed.2d 1079 (1977), a prior valid judgment

operates as an absolute bar to a second suit between the same parties or their privies based on the same cause of action not only in respect of every matter actually litigated, but also as to every ground of recovery or defense which might have been presented.

*Accord, Scoggin v. Schrunk,* 522 F.2d 436, 437 (9th Cir. 1975), *cert. denied,* 423 U.S. 1066, 96 S.Ct. 807, 46 L.Ed.2d 657 (1976) (prior judgment "serves not only to bar every claim that was raised in state court but also to preclude the assertion of every legal theory or ground for recovery that might have been raised in support of the granting of the desired relief."); *cf.* Restatement of Judgments § 61(1) (Tent. Draft No. 5, 1978) ("the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose."). Furthermore, consideration of a *res judicata* defense is appropriate even though the *McCubbrey* judgment was based upon a stipulated settlement. *Green v. Ancora-Citronelle Corp.,* 577 F.2d 1380 (9th Cir. 1978).

■■■■■ Plaintiffs seem to argue that there is a basic unfairness in applying *res judicata* when the prior judgment was a class action settlement.[19] But the very purpose of the procedural safeguards set forth in rule 23 of the Federal Rules of Civil Procedure is to mitigate the sometimes harsh consequences of *res judicata* by requiring that representation, and, where applicable, notice be adequate. *Cf. Gibson v. Local 40, Supercargoes and Checkers of ILWU,* 543 F.2d 1259, 1265 (9th Cir. 1976) ("There is 'a duty upon the court to consider carefully the requirement of fair and adequate protection in view of the serious consequences of res judicata in class actions.' ") (quoting *EEOC v. Detroit Edison Co.,* 515 F.2d 301, 311 (6th Cir. 1975) (Title VII class action), *vacated and remanded for further reconsideration,* 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977)). If these requirements are met, there are few instances in

---

**19.** In their July 12 memorandum of points and authorities, plaintiffs state,

A class action settlement agreement should be construed as an adhesion contract with respect to unnamed class members. *Allstate Insurance Co. v. Reeves* (1976) 62 Cal.App.3d 284, 289–290, 132 Cal.Rptr. 826. They are presented with the settlement on a take-it-or-leave-it basis. They do not have the same freedom of bargaining that normal traders

do, and the settlement agreement should be strictly construed in their favor.
The cited decision (vacated and reissued at 66 Cal.App.3d 464, 136 Cal.Rptr. 159 (1977); hearing granted California Supreme Court, March 31, 1977), has nothing to do with class actions or settlements, and the cited pages merely discuss the general principle that "insurance contracts are contracts of adhesion between parties not equally situated."

which a class action defendant should not receive the full benefit of the doctrine of res judicata whether based upon a trial on the merits or settlement. Indeed, if any distinction between class actions and non class actions is warranted, one might well argue for more liberal application of res judicata based upon a class action settlement wherein the requirement of court approval prevents the overreaching that might otherwise occur. Furthermore, restricting the res judicata effect of class action settlements would lessen a defendant's incentive to settle, which would be unfortunate for reasons recently noted by the Ninth Circuit:

> It hardly seems necessary to point out that there is an overriding public interest in settling and quieting litigation. This is particularly true in class action suits which are now an ever increasing burden to so many federal courts and which frequently present serious problems of management and expense.

Van Bronkhorst v. Safeco Corp., 529 F.2d 943 (9th Cir. 1976) (footnotes omitted); United States v. McInnes, 556 F.2d 436 (9th Cir. 1977).

### A. Antitrust Claims

■ The defendants' assertion that counts I through VI of plaintiffs' complaint "are an attempt to drape antitrust trappings on previously discharged misrepresentation claims" is well taken. Many of these allegations fail to state a cause of action under the antitrust laws and to the extent that they do, they are barred by the McCubbrey judgment and the releases given the McCubbrey defendants.

Counts I and II of the Valerio Complaint allege violations of sections 1 and 2 of the Sherman Act, respectively. Count I in particular is perhaps the bests example of the plaintiffs' sometimes clever, often ludicrous, attempts to reshape the fraud allegations of the McCubbrey complaint into antitrust claims. Count I begins with paragraph 28, which in essence is a summary of the allegedly false representations made to the McCubbrey class and listed in that complaint. There follow allegations that because of this unlawful conduct the property has decreased in value and the Boise defendants through defaults and foreclosures, and purchases have reacquired fee ownership of large blocks of the property in the recreational land subdivisions at low prices. Count I contains further allegations that Boise has then proceeded to sell this property to defendants Hidden Valley Lake Properties, Inc. and Mountain Home Properties, Inc.,[20] at prices lower than those at which Boise sold similar property to the plaintiffs. There also are allegations of exclusive dealing contracts between the above-mentioned defendants, as well as allegations of conspiracies to file baseless lawsuits.[21]

The gravamen of plaintiffs' complaint in count I, that the property is not worth what they paid for it, also was at the heart of the McCubbrey action.[22] This is demonstrated

---

**20.** By stipulation and order dated July 25, 1977, this action was dismissed without prejudice as to Mountain Home Properties.

**21.** Plaintiffs also allege "[t]he above-mentioned agreements [exclusive purchaser/seller agreements] between the Boise defendants, Hidden Valley Lake Properties, Inc. and Mountain Home Properties, Inc. . . . set and fix prices for real property and securities." Valerio Complaint at 17. While plaintiffs allege that defendants' conduct results in the setting and fixing of prices, they do not specifically allege price-fixing as a basis for relief. Plaintiffs proceed in their memoranda, however, as if they have alleged price-fixing. Assuming arguendo that they have, we are baffled as to the connection between such an allegation and the remainder of their complaint. If their contention is that defendants have agreed to set prices at an artificially low level, that complaint is subsumed in our discussion of the allegations of predatory pricing. If plaintiffs' contention is that the alleged price-fixing maintains prices at an artificially high level, this would be inconsistent with their other allegations and we fail to see how they, as competitors, could demonstrate any damage arising out of such an agreement.

**22.** Although we do not ground our decision on the plaintiffs' depositions, they reveal that plaintiffs have made attempts, both prior and subsequent to the McCubbrey settlement to sell their property. They obviously have not been successful, apparently for reasons unrelated to these alleged conspiracies to destroy them as competitors. For example, when plaintiff

both by pages 16 to 19 of the complaint, which lists 25 allegedly false representations made concerning the "value, resale and investment potential," of the lots sold the *McCubbrey* class, as well as that portion of the complaint that asked for damages equal to the difference between the purchase price and actual value of the lots as well as the difference between the purchase price and the value of the lot as represented to each class member. Amended *McCubbrey* Complaint at 51. These facts, along with the *Valerio* Complaints' focus on conduct alleged to have commenced in 1967, see, e. g., ¶s 28, 30 and 38, warrant a finding that this count and count II, which alleges an unlawfully obtained and maintained monopoly, are barred by the *McCubbrey* judgment as well as the release.

■ We, however, need not rest our decision on that basis alone, for it also is evident that many of the specific allegations of count I fail to state a claim upon which relief can be granted. For example, plaintiffs' allegation that the defendants are selling lots at prices lower than what the plaintiffs paid for their own lots does not in itself state a violation of the antitrust laws. And that remains the case even if, as plaintiffs contend in their memorandum, this is construed as an allegation of predatory pricing. As recently stated by the Ninth Circuit,

> Pricing is predatory only where the firm foregoes short-term profits in order to develop a market position such that the firm can later raise prices and recoup lost profits.

*Janich Bros. Inc. v. American Distilling Co.,* 570 F.2d 848, 856 (9th Cir. 1977). It is difficult to consider the plaintiffs, who between them own three lots, or even the *McCubbrey* class as a whole, who purchased their property from Boise, as competitors whom the defendants are trying to destroy. Assuming arguendo that plaintiffs are competitors, there remains yet another, insurmountable, barrier to stating a claim of predatory pricing in this case: once the defendants and plaintiffs have sold their lots they will all be out of business. In other words, there really is no possibility of recouping lost profits because once a lot is sold, unlike a fungible manufactured product for instance, it cannot be replaced and in most instances the customer is lost, because his needs are satisfied, to both the seller and the competitor whom he is trying to destroy. This is not to say that a large realtor in head-to-head competition with another competitor might not engage in predatory pricing, though we confess we find this rather implausible, but only that plaintiffs have failed properly to plead predatory pricing and there are no facts that would support such a claim in this case.

For reasons similar to those stated above, it is equally clear that plaintiffs' section 2 monopolization claim cannot stand. We are unable to comprehend how defendants can have obtained and maintained a "monopoly of marketable recreational land at Hidden Valley Lake and Pine Mountain Lake Subdivisions and in near Northern California," by selling that very property.

■ Plaintiffs' allegations that defendants have filed baseless lawsuits also do not state an antitrust claim. Plaintiffs contend that the small claims actions for unpaid assessments were and are baseless because the grounds for venue were false and many of the claims "clearly were barred by the applicable statute of limitations," as well as

---

Chang, an employee of the San Francisco Zoo, attempted to sell one of his lots in 1970, some realtors told him that "there were a lot of lots that were not sold by Boise Cascade yet, so that I didn't have much of a chance to do anything about it." Chang Deposition at 86–89. Plaintiff Valerio, a salesman of steel fabricated products, was able to find only one broker who was interested in attempting to sell his lot. Other brokers "didn't refuse outright, they just said, It's not worth our while to do it."

Q. Did they explain to you?
A. Explained to me there is no way I can sell that lot up there.
Q. Did they say why?
A. Well, because of all the class action—adverse publicity. Because of the—basically how—that they were not sellable. They wouldn't even trade them.
Valerio Deposition at 105–06.

other matters set forth in the complaint. With respect to the statute of limitations argument, plaintiffs' complaint alleges that plaintiff Valerio has never paid any assessments and plaintiff Chang has paid only those assessments for which defendants obtained a judgment. The complaint further alleges that many of the class members have refused to pay any assessments levied since they first purchased their property. Thus plaintiffs' assertion of a clear statute of limitations bar is refuted by the allegations of their own complaint, including the fact that the defendants have won some of these suits. This latter fact is also relevant to the allegations regarding false venue. But even if plaintiffs' complaint were not internally contradictory, recent decisions have held allegations similar to those of count I insufficient to state a claim for relief.

In *Franchise Realty Interstate Corporation v. San Francisco Local Joint Executive Board of Culinary Workers*, 542 F.2d 1076 (9th Cir. 1976), *cert. denied*, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977), the Ninth Circuit thoroughly analyzed the "sham" exception to the *Noerr-Pennington* rule that efforts to influence public or judicial [23] officials do not violate the antitrust laws even if done for an anticompetitive purpose. *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). The court stated,

> The Supreme Court has consistently recognized the sensitivity of First Amendment guarantees to the threat of harassing litigation, and has erected barriers to safeguard those guarantees. *See, e. g., Time, Inc. v. Hill*, 1967, 385 U.S. 374, 387–91, 87 S.Ct. 534, 17 L.Ed.2d 456; *New York Times Co. v. Sullivan*, 1964, 376 U.S. 254, 267–83, 84 S.Ct. 710, 11 L.Ed.2d 686; *N.A.A.C.P. v. Button*, 1963,

371 U.S. 415, 431–33, 83 S.Ct. 328, 9 L.Ed.2d 405. Because we think that similar values are endangered in this case, we hold that in order to state a claim for relief under the *Trucking Unlimited* exception, a complaint must include allegations of the specific activities, not protected by *Noerr*, which plaintiffs contend have barred their access to a governmental body. The deficiencies of *McDonald's* amended complaint in this regard are evident from what we have said above. Dismissal of that complaint was proper.

*Franchise Realty, supra* at 1082.

Applying the holding of *Franchise Realty*, in which the "governmental body" was the Board of Permit Appeals, to a situation involving allegedly sham lawsuits, the district court in *Ernest W. Hahn, Inc. v. Codding*, 423 F.Supp. 913 (N.D.Cal.1976), stated,

> Defendants are alleged to have begun "baseless" litigation whose only purpose was the delay or frustration of the project. Whatever their motives in instituting the actions, defendants were obviously seeking official action by a governmental body. By its very nature, litigation is a process which seeks official decision—a determination on the merits of the action by a court.

> . . . . .

> The most plaintiff has alleged here is that litigation was instituted for an anticompetitive purpose. But an anticompetitive motive is clearly not enough to convert otherwise privileged First Amendment activity into a violation of the Sherman Act.

*Id.* at 916–17. The court concluded its general discussion with a statement that expresses our own sentiments very well:

> For this court to find that an allegation that litigation has been brought for an anticompetitive purpose states a claim under the antitrust laws would be to go further than any of the authorities, and

---

**23.** In *California Transport v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Court applied the *Noerr-Pennington* doctrine to administrative and judicial proceedings. The Court also stated an exception to the

general rule of immunity where the conspiracy was directed toward harassing "and deter[ing] their competitors from having 'free and unlimited access' to the agencies and courts." *Id.* at 515, 92 S.Ct. at 614.

652

would effectively discourage litigants from bringing lawsuits for fear of possible liability under the antitrust laws. *Id.* at 917.

◾ Finally, plaintiffs make reference to exclusive dealing contracts between Boise and defendants Hidden Valley Lake Properties, Inc. and Mountain Home Properties, Inc. We believe defendants were overly generous in stating in their memorandum that "plaintiffs have technically pleaded the type of arrangement which is known as an exclusive dealing agreement." As is apparent from their memorandum, defendants have assumed that plaintiffs are complaining of a refusal by defendants to sell plaintiffs' land. That, however, is not the case. Plaintiffs do allege an agreement

whereby Hidden Valley Lake Properties, Inc. and Mountain Home Properties, Inc. are the exclusive purchasers and sellers of property and securities at Hidden Valley Lake and Pine Mountain Lake Subdivisions, respectively, which are owned by the Boise defendants, and whereby Hidden Valley Lake Properties, Inc. and Mountain Home Properties, Inc. sell no property at those locations *which is owned by any other entity.*

Complaint at 15 ¶ 35 (emphasis added). They, however, do not contend that the defendants have refused to market or sell plaintiffs' property; in fact, ¶ 34 states,

At this time no broker *other than defendant Hidden Valley Lake Properties, Inc.* will actively attempt to market or sell the above-mentioned real property and securities of plaintiffs or of the class at Hidden Valley Lake Subdivision because of the activities of the defendants which are alleged in this complaint. And although *entities other than defendant Mountain Home Properties, Inc.* will actively attempt to market the above-mentioned real property and securities of plaintiffs and of the class at Pine Mountain Lake Subdivision, they are severely disadvantaged in so doing because of the above-mentioned activities of the Boise defendants and defendant Mountain Home Properties, Inc.

(emphasis added). Thus, even if these claims were not otherwise barred, they fail to state a claim by plaintiffs Valerio and Chang against the defendants.

◾ The appropriateness of summary judgment for the defendants is most clear with respect to counts III, IV, V and VI. Count VI purportedly is a claim under the Robinson-Patman Act for price discrimination in the sale of real property and securities by the defendants. It suffices to say that real estate and intangibles are not commodities within the meaning of the Act. *Export Liquor Sales, Inc. v. Ammex Warehouse Co.,* 426 F.2d 251, 252 (6th Cir. 1970), *cert. denied,* 400 U.S. 1000, 91 S.Ct. 460, 27 L.Ed.2d 451 (1971); *Ernest W. Hahn, Inc. v. Codding,* 423 F.Supp. 913, 919 (N.D.Cal. 1976) (real estate); *Baum v. Investors Diversified Services, Inc.,* 409 F.2d 872, 875 (7th Cir. 1969) (mutual fund shares). Counts III, IV and V, which plaintiffs have denominated "Sherman and Clayton Act Claims" are not cognizable under the Clayton Act for similar reasons.

◾ While the allegations in these three counts are hardly paragons of clarity, in essence they assert tie-ins between the sales of lots on the one hand and the memberships in the homeowners' association, the shares in the Stonehouse Mutual Water Company and the acquisition of the Hidden Valley Lake Country Club on the other hand. Section 3 of the Clayton Act, 15 U.S.C. § 14, however, requires that the items involved be "goods, wares, merchandise, machinery, supplies, or other commodities." 15 U.S.C. § 14. Since real estate is not a commodity, plaintiffs cannot state a cause of action under the Clayton Act. *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1214 (9th Cir. 1977) (tie-ins involving cemetery lots; "A better rule is that § 3 applies only if both the tying and tied items fit the definition."). *See Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 13 & n. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) (Harlan, J., dissenting); L. Sullivan, Handbook of the Law of Antitrust 433 (1977) ("It [§ 3] presumably has no application . . . to land transactions . . . ."). Such

claims might conceivably state a claim under Section 1 of the Sherman Act, *see Northern Pacific, supra; Moore, supra,* but we find that they are barred by the *McCubbrey* judgment and/or release.

Count XV of the amended *McCubbrey* complaint alleged that the class members were entitled to recover all assessments already paid to homeowners' associations and the water companies, to be relieved of liability for such assessments, and to have liens for such assessments removed or subordinated to class members' equitable venders' liens upon their lots. The *McCubbrey* class based their claim that the assessments were invalid on the facts alleged in the complaint, which included alleged misrepresentations regarding utilities and recreational amenities. Among the latter, were representations

> That Boise would construct or provide or improve certain recreational facilities at no cost to lot owners.
>
> . . . . .
>
> That recreational facilities and amenities at certain projects would be turned over to property owners' associations at no cost to such associations;

Amended *McCubbrey* Complaint at 21, 24. These same allegations were among those listed in the notice that was sent to plaintiffs Valerio and Chang, which not only advised them that these were matters raised in the lawsuit and denied by defendants, but also that

> If you file a claim you will have done so in full and final satisfaction of all known, unknown, present and future claims of any kind which arise from your purchase of property at any of the Boise projects, and which are raised or could be raised in the amended complaint. . . .

Plaintiffs Valerio and Chang seek relief, i. e., an order discharging liens obtained by the defendants and giving plaintiffs a refund of assessments already paid, that is similar to that sought in *McCubbrey.* The alleged antitrust violation that underlies their request is but another legal theory that could have been asserted, and probably would have been asserted had

the *McCubbrey* class's attorneys thought it to be of any merit, in support of the allegations of count XV of the *McCubbrey* complaint. And, as we already have stated, the effect of a prior determination cannot be avoided by " 'clothing the claim in different garb.' " *In re Orbitec Corp.,* 392 F.Supp. 633, 636 (S.D.N.Y.1975).

Admittedly, count III alleges conduct, the acquisition of the Hidden Valley Lake Country Club by the Hidden Valley Lake Association, that occurred after *McCubbrey* was settled. It is unclear how this allegation could under any circumstances state a tying claim, as it appears that it is but a consequence or the original tie-in, assuming arguendo there was one, between the lots and the memberships in the homeowners' associations. In any event, this claim is barred by the *McCubbrey* judgment for, as shown above, the plaintiffs' primary complaint, that the country club, which operates at a deficit, imposed unwanted costs upon the associations' members, was very much an issue at the time *McCubbrey* was settled. Indeed, at the time of the settlement, negotiations for the transfer of the Hidden Valley Lake Country Club to the association were underway, and this was mentioned by one objector at the fairness hearing, held on May 15, 1973, in a context that made it very clear that this claim was covered by the settlement:

> At the present time, Boise Cascade is attempting to make the Hidden Valley Lake Association—that is the property owners—take over the golf course and the club house. The operating expenses of the golf course are over $100,000 a year, and the cost of operating the club house is not known to me, but it operates at a loss.
>
> . . . . .
>
> There is no way that the Hidden Valley Lake Association can operate the aforementioned recreation facilities without a tremendous financial burden being put upon the users of the facilities.
>
> Therefore, I ask that the settlement be amended so that restitution or relief be given to the users of the facilities.

(RT 36–37. Comments of J. J. Cabezud, objector to the *McCubbrey* settlement.)

At this court's request counsel for the plaintiffs responded as follows to this matter and Mr. Cabezud's concern about the improvements he had made on his property:

Your Honor, we have, in connection with the problem of the costs to the home owners on the Home Owners Association and restrictions, the committee has had an independent investigation made of the deed restrictions in the Hidden Valley Lake project. It is our opinion that costs that are being complained about, which are included in the restrictions, in the Association restrictions, are payable pro rata by the owners of the lots. Those would include those lots which were owned by Boise before they were sold, and those lots which Boise may take back and buy, return through this process, or any other process.

So I think that we are saying as far as the legality is concerned, in our view, the costs are spread over the lots. To the extent that Boise gets lots back, they would increase their pro rata share.

. . . . .

THE COURT: Mr. Elke, take this gentleman's case, can he tender the house and lot back and receive the value of the improvements and the lot?

MR. ELKE: No, Your Honor, he cannot do that.

THE COURT: Then what is his recourse?

MR. ELKE: His recourse, to the extent that he has been harmed, and I certainly, from hearing him, I am convinced he thinks he is, would be an independent suit, Your Honor, I think.

. . . . .

. . . I cannot here say that I would advise this gentleman to do anything other than opt out.

(RT 38–40.)

We thus are confident in holding that counts III through V are barred by the *McCubbrey* judgment quite apart from the effect that the release has on these claims.

_____ Counts VII and VIII are denominated pendent claims of unfair competition. As with most of the other pendent claims, these can be and are dismissed as a consequence of the failure of the federal claims upon which this court's jurisdiction was invoked. *Toensigg v. Brown,* 528 F.2d 69, 72 (9th Cir. 1975). We note also, however, that count VII, which conclusionally alleges predatory pricing, would be deficient for reasons stated earlier. Furthermore, counts IV and V of the amended *McCubbrey* complaint specifically pled violations of the California Unfair Practices Act and claims of unfair competition, respectively. Thus, an alternative basis for our holding is that counts VII and VIII, which are based upon the defendants' failure to disclose in their advertisements and circulars that the property and securities being sold are required to be registered but are not so registered, see below, are barred by the *McCubbrey* judgment and release.

B. *Securities Claims*

In counts IX through XIV of their complaint, plaintiffs allege violations of state and federal securities laws. Count IX defines the securities involved as the plaintiffs' interests in their lots, their assessable memberships in the homeowners' association (these memberships are received automatically when a buyer purchases a lot) and their shares in the Stonehouse Mutual Water Company, which is an entity owned by the members of the Hidden Valley Lake Association. The gravamen of count IX, as stated in paragraph 102, which is incorporated by reference in the other securities counts, is that the defendants concealed their failure to register these securities.

The other alleged securities violations are as follows: Count X alleges a failure to deliver a prospectus that satisfies the requirements of § 10 of the Securities Act of 1933, 15 U.S.C. § 77j. In count XI plaintiffs allege a number of misrepresentations and omissions allegedly made in connection with the sales of these securities: defendants, *inter alia,* allegedly asserted that the sales were lawful when in fact they were

not; they omitted to state that the securities were required to be registered; they omitted to state "that the sale of the issue of which it is a part is unlawful and voidable," etc. Count XII alleges a violation of 15 U.S.C. § 77q,[24] and it also seems to allege a violation of rule 10(b)(5) though this is not explicitly stated. Count XIII, however, does allege a violation of rule 10(b)(5): that the failure to disclose the nonregistration of the securities was a fraud upon the plaintiffs. Finally, count XIV alleges a violation of the California Corporate Securities Act in that "[e]ach such security was sold and is being offered for sale and sold by means of an untrue statement of a material fact and by means of an imission [sic] to state a material fact, as alleged above."

In counts II and VI, the amended *McCubbrey* complaint also alleged violations of federal and state securities laws respectively. There was no attempt, however, to parse out the homeowners' association memberships and the shares in the water company as separate securities. Instead, count II alleged that the lots purchased from the Boise defendants, and the class members' investments made by purchasing those lots constituted securities within the meaning of section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), and section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1). Whereas the emphasis in *Valerio* is upon failure to register these securities and other technical shortcomings, and concealment thereof, the focus in *McCubbrey* was in a practical sense much broader. Count II alleged that the defendants violated section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and sections 12(2) and 17(a) of the Securities Act, 15 U.S.C. § 77*l*(2) and 77q(a), by engaging in other fraudulent practices all in connection with the sale of the abovementioned securities. Paragraphs 25 and 26 of the *McCubbrey* complaint, which were incorporated by reference into count II, listed at great length (31 pages) many of the allegedly false and misleading representations made by the defendants to induce the *McCubbrey* class to enter into land sales contracts.[25]

---

**24.** The amended *McCubbrey* complaint specifically pled a violation of section 77q(a) which prohibits the use, in the offer or sale of securities, of the instrumentalities of interstate commerce

 (1) to employ any device, scheme, or artifice to defraud, or
 (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

The plaintiffs appear to allege violations of section 77q(a) as well as 77q(b), which states,

 (b) It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

**25.** Paragraph 28 of the *Valerio* complaint is in essence a summary of paragraphs 25 and 26 of the *McCubbrey* complaint. It states,

 28. Commencing in 1967 and continuing to the present, the Boise defendants have been engaged in the purchase and sale of real property and securities at Hidden Valley Lake Subdivision in Lake County, California, Pine Mountain Lake Subdivision in Tuolumne County, California, and at other places in and near Northern California, by fraud, deceit and other tortious and unlawful means. Said means include untrue statements, both oral and written, or material concealments, or both, concerning that property and securities and their value, resale and investment potential; their scarcity and the demand therefor; the recreational amenities, facilities and opportunities at and near them; the availability, installation and maintenance of roads, utilities and similar services at them; the development and construction and plans for same on, at or near them; the scenic attractions, physical characteristics, boundaries, easements, vegetation, terrain, suitability for building, subdividability, ownership, marketability, fungibility, taxes, assessments, interest on promissory notes, and complaint handling on, at and near them; the existence of

Plaintiffs make two arguments against the application of *res judicata* to these claims. First, they contend that doctrine is inapplicable in light of section 14 of the Securities Act of 1933, 15 U.S.C. § 77n, which states,

> Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.

In support of their position, plaintiffs cite *Pearlstein v. Scudder & German,* 429 F.2d 1136 (2d Cir. 1970), *cert. denied,* 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971), wherein the Second Circuit relied in part on a similar provision of the 1934 Act to deny the *res judicata* effect of a settlement obtained in an earlier suit brought by the defendant against *Pearlstein. Pearlstein,* however, is easily distinguished from the instant case, because the *McCubbrey* settlement, in contrast to the *Pearlstein* settlement, does not itself violate the Act. The implication in plaintiff's argument that any settlement of a securities action can be given no legal effect is simply untenable. As stated in *Murtagh v. University Computing Company,* 490 F.2d 810, 816 (5th Cir.), *cert. denied,* 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 62.

> [S]ettlements of claims arising from acts which are violations of the securities laws are not void as a matter of law, at least where such settlement agreements do not *themselves* continue the precise conduct which violates the law.

(emphasis added). *Accord, Cohen v. Tenney Corp.,* 318 F.Supp. 280, 284 (S.D.N.Y.1970). We note also that the Ninth Circuit in *Green, supra,* did not hesitate to apply collateral estoppel based upon a prior settlement in state court, to plaintiff's federal securities action.

Plaintiffs' second argument is that *McCubbrey* does not bar their securities claims because some of the sales took place after that settlement. Plaintiffs Valerio and Chang do not deny that they purchased their lots and received their memberships in the homeowners' associations and their shares in the water company prior to the *McCubbrey* settlement. They, however, argue that the annual assessments made by the associations and the water company constitute the offer and sale of a security, and hence by failing to register these securities, deliver prospectuses, etc., the defendants have committed post-*McCubbrey* securities violations.

For many of the same reasons stated earlier, we do not believe that the plaintiffs can so facilely avoid the *res judicata* effect of *McCubbrey.* Count XV of the amended *McCubbrey* complaint alleged that the assessments payable to the property owners' associations and water companies were invalid. It is apparent that the plaintiffs here are simply attempting to relitigate that issue under the guise of a new, rather novel, theory. It might be of some relevance to a statute of limitations defense, but it does not preclude us from holding that plaintiffs' securities claims are barred by the *McCubbrey* judgment.

### C. *Pendent Claims*

As stated earlier, plaintiffs' pendent claims properly may be dismissed without further analysis. For most of them, however, there are other independent grounds for ruling in defendants' favor and we briefly note these.

Count XV alleges that the attorney-defendants and the Boise defendants induced the *McCubbrey* class to enter into the settlement agreement by misrepresenting and concealing material facts. As clarified by

---

nearby freeways or plans for same; the compliance with applicable state and federal laws regarding their sale; and others.

Apparently to avoid the *res judicata* effect of *McCubbrey,* the plaintiffs in *Valerio* do not base their claims for relief on these very serious misrepresentations. Rather, they argue and allege that these misrepresentations as to

the value of the land, recreational facilities, the existence of freeways, etc., were merely among the means by which the Boise defendants concealed what is truly *the* material fact upon which the plaintiffs relied to their detriment; i. e., that the Boise defendants did not register the securities sold to the plaintiffs.

plaintiffs' memoranda and explicitly stated in plaintiffs' proposed amended complaint, defendants alleged liability arises out of the preparation of the notice sent to the *McCubbrey* class. We already have rejected these alleged deficiencies as a basis for a finding that the notice did not satisfy due process. We doubt that plaintiffs could nevertheless state a claim for fraud, but we need not decide that issue for this claim is time barred as to the Boise defendants for the same reasons that we held it time barred as to the attorney defendants.

Count XVI alleges that the Boise defendants, the defendant homeowners' associations and the Stonehouse Mutual Water Company had no intention to and have not complied with the terms of the settlement agreement. With respect to the homeowners' associations and Stonehouse, it suffices to say that they were not parties to the settlement agreement itself. As for the Boise defendants, to the extent that plaintiffs' complaint is that the *McCubbrey* settlement has been violated, their remedy lies first with the Attorney General as provided for in paragraph E–5 of the settlement agreement. These statements apply equally to counts XXVI and XXIX, the latter directed solely to the Boise defendants, which more specifically allege breaches of the *McCubbrey* settlement agreement.

Counts XIX through XXII of the *Valerio* complaint allege common law fraud based on conduct that is essentially the same as that alleged in the securities counts. It follows, therefore, that these claims also are barred. This also is true of count XXVIII, which alleges that the defendants negligently misrepresented that the sale of securities was lawful.

Count XXIII is based upon the participation of the defendants' attorneys in the drafting of the amended *McCubbrey* complaint. Plaintiffs contend that those attorneys thereby incurred fiduciary duties to the *McCubbrey* class, which duties were violated by, *inter alia,* failing to include all causes of action that had then accrued to the plaintiffs. We are somewhat puzzled by this complaint since if there is any prob-

lem in having defendants participate in the drafting of the complaint, it would be that they would tend to be overly inclusive in order to protect their clients from future litigation. In any event, plaintiffs have failed to state a claim for relief here. It is hardly unusual for defendants' attorneys to participate in the drafting of the amended complaint that will be the basis of the settlement. *See* Haudek, *The Settlement and dismissal of Stockholders Actions—Part II: The Settlement,* 23 Southwestern L.J. 765, 773 (1969). *See also Pergament v. Frazer,* 93 F.Supp. 13, 20 (E.D.Mich.1950).

The claims stated in counts XXVII and XXX arise out of the acquisition of the Hidden Valley Lake Country Club by the Hidden Valley Lake Association, allegedly in breach of the "original agreement of sale." These claims are barred by the *McCubbrey* judgment for the reasons stated in our discussion of plaintiffs' tying claim based on this same conduct.

Finally, counts XXXII through XXXVII center around the validity of the assessments levied by the homeowners' associations and Stonehouse Mutual Water Company. The last four counts, specifically, are listed under the heading "Pendent Declaratory Relief Against Small Claims Actions and the Collecting of Assessments by Methods Not Approved by Law." Count XIV of the amended *McCubbrey* complaint was for declaratory relief concerning the respective rights and duties of the defendants and the class, and, as noted earlier, count XV of the *McCubbrey* complaint specifically challenged the validity of the assessments. Thus these claims are barred by *McCubbrey* for these reasons and others discussed elsewhere in this opinion. We note further that even if these claims were not barred by *McCubbrey* we most likely would decline to exercise jurisdiction over these challenges to the methods by which the assessments have been collected. That is a question best decided by state courts.

## IV

There remain to be decided the plaintiffs' motion to amend their complaint and their

requests for subpoenas duces tecum and various other discovery to prove their claim of fraud on the court. The latter question obviously is moot in light of our rulings. Our decision also dictates denial of the motion to amend.

■■■■ In most instances leave to amend a pleading is given freely. But amendment properly may be denied where, as here, the amended complaint is as vulnerable to motions to dismiss and for summary judgment as the original. *See, e. g., Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Bricker v. Crane,* 468 F.2d 1228, 1233 (1st Cir. 1972), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1368, 35 L.Ed.2d 592 (1973). Many of the proposed amendments are designed to meet the defendants' statute of limitations arguments. They of course would not alter our decision here since it is not based on statute of limitations. Nor would these amendments be relevant to our earlier decision, which was based on that defense, in light of our determination that the statute of limitations on the claims against the attorney defendants began to run, at the very latest, in the fall of 1973 when plaintiffs received their settlement checks. Other amendments to existing counts include an expansion of paragraph 102 (count IX) to list all of the means by which defendants allegedly concealed their failure to register securities, and, as mentioned earlier, paragraph 132, as amended, centers around alleged misrepresentations and concealments in the notice. Paragraph 132 also states additional misrepresentations that were not mentioned in the original complaint. These amendments also have no bearing on our rulings.

■■■ The most substantive changes effected by the proposed amendment are the addition of claims for fraud on the court and for inadequate representation. The latter count includes an allegation that the notice to the class did not satisfy the requirements of due process. The substance of those counts, however, was stated in plaintiffs' memoranda and the questions raised thereby necessarily were decided by this court in ruling on the merits of the defendants' motions. It would be a useless act to allow these amendments. This is equally true of plaintiffs' allegations of satisfaction or attempted satisfaction of the prerequisites for filing a lawsuit against the Attorney General: our decision in the Attorney General's favor was not based on lack of jurisdiction.

The motion to amend, therefore, is denied.

## CONCLUSION

In substance, if not in form, the gravamen of plaintiffs' lawsuit is that the *McCubbrey* settlement was inadequate. There perhaps are many who, with the benefit of hindsight, might well agree with that position. In 1973, however, we were satisfied not only with the adequacy of the representation and notice given the class but also with the adequacy of the settlement. The plaintiffs could have challenged our conclusion in the Ninth Circuit Court of Appeal. They chose not to do so. They cannot now relitigate that issue behind a rhetorical smokescreen of fraud and conspiracy.[26]

It is hereby ordered that the motions for summary judgment of the "Boise defendants,"[27] Pine Mountain Lake Association,

---

**26.** The genesis of this lawsuit, as revealed by plaintiffs' depositions, raises some troublesome questions regarding the role of attorneys in the institution of litigation. Essentially, the plaintiffs went into their attorneys' offices to obtain relief in the small claims actions pending against them. They walked out with a 1.8 billion dollar lawsuit against 28 defendants alleging conspiracies between all of these defendants to do all of the acts alleged in the complaints' 37 counts. A layperson, of course, is not expected to be aware of the legal theories

that are relevant to the facts he has presented his attorney. The plaintiffs here, however, have virtually no personal knowledge of the facts underlying many of their claims. Almost invariably their response to questions, seeking the sources of their allegations, was, "My attorneys told me."

**27.** Although there is some ambiguity in plaintiffs' complaint, the "Boise defendants" appear to be:

Hidden Valley Lake Association, Stonehouse Mutual Water Company and its directors are granted.

It is further ordered that the motion to dismiss of defendant Hidden Valley Lake Properties, Inc. is granted.

IT IS SO ORDERED.

APPENDIX A

EXHIBIT A

J. BRUCE McCUBBREY et al., Plaintiffs,

vs.

BOISE CASCADE HOME & LAND CORPORATION, et. al., Defendants.

No. C–72–470–RFP

United States District Court,
N. D. California.

May 14, 1973.

AFFIDAVIT OF EDWARD W. CLEARY, VICE PRESIDENT AND TREASURER OF BOISE CASCADE CORPORATION

STATE OF CALIFORNIA )
) ss.
CITY AND COUNTY OF SAN FRANCISCO )

I, EDWARD W. CLEARY, being first duly sworn, depose and say:

1. I am and since July 25, 1968, have been Vice President and Treasurer of Boise Cascade Corporation (Boise). My primary responsibility relates to the relations between Boise and its lenders. All references herein to Boise are to Boise Cascade Corporation, the parent corporation. Boise Cascade Home & Land Corporation (Home & Land) is a wholly-owned subsidiary of Boise and was created to own and operate substantially all of the real estate and real estate oriented properties and businesses of Boise. Home & Land has numerous subsidiaries, but for the purpose of this affidavit references to Home & Land mean Home & Land and all of its subsidiaries, and financial figures given for Home & Land are on a consolidated basis. One principal wholly-owned subsidiary of Home & Land is Boise Cascade Credit Corporation (Credit Corporation) which was created to purchase from Home & Land notes and other receivables secured by real property. Home & Land directly and through its subsidiaries owns and operates or operated recreational communities, residential communities, mobile home communities, urban housing, mobile home manufacturing and commercial real estate developments. All references herein to "realty operations" include substantially all of the operations of Home & Land.

2. Boise's principal business is lumber, paper and packaging, building materials and factory-built housing. Boise entered into the realty operations in the latter part of the 1960's by initially acquiring partnership interests in businesses in which Boise was the financial partner and the other partner the operator. By 1968 Boise had acquired these entire businesses from its partners and also acquired other land development companies.

3. The provisions of Boise's then existing long-term loan agreements were tailored to a manufacturing company and were not structured to apply to the realty operations. In 1967 Boise revised its long-term loan agreements to contain the concept of an "excluded subsidiary." Boise created Home & Land and transferred to it most of its realty operations and realty subsidiaries. The renegotiated loan agreements limited Boise's investment (defined to include advances) in Home & Land to not more than $100 million and contained a limitation on the amount of obligations of Home & Land which Boise could guarantee.

4. As the result of the ever increasing cash demands of Home & Land, the follow-

Boise Cascade Corporation
Boise Cascade Home and Land Corporation
Boise Cascade Recreation Communities Corporation of Delaware

Boise Cascade Properties, Inc.
Boise Cascade Credit Corporation

ing further financing was undertaken: (a) In 1969 Boise's investment in Home & Land was permitted to increase to $150 million provided the additional $50 million would be withdrawn by December 31, 1972, and the original restriction on an investment level of $100 million would be reinstituted; (b) Boise entered into a revolving credit arrangement and utilized short-term lines of credit with major banks throughout the United States, Canada and Europe to provide financing in addition to its long-term insurance company financing; (c) in April of 1971 Home & Land concluded a $200 million revolving credit loan with ten major banks in the United States and Canada to substitute for its then short-term bank borrowings; and (d) Boise effected two additional insurance company long-term loans totaling $75 million.

5. In the first half of 1971 Boise suffered its first serious financial setback and in June announced an extraordinary charge against consolidated earnings of $78 million before taxes ($48 million after taxes). $34 million of this extraordinary charge was attributable to realty operations and most of the balance was attributable to the write-off of a construction joint venture in which Boise was a partner. For the year ended December 31, 1971, Boise and its consolidated subsidiaries reported a loss of $37 million, plus the foregoing after-tax extraordinary charge of $48 million, or a total loss of $85 million. The realty operations showed a net after tax loss of $46 million before the extraordinary charge attributable to them. At the end of 1971 Boise was barely able to comply with its loan covenants, and because of many adverse factors affecting realty operations substantial additional cash was required by Home & Land which could not be advanced from Boise under its loan agreement restrictions.

6. During the spring of 1972 Boise commenced negotiations with all lenders in an attempt to acquire additional cash and credit for Home & Land. The full impact of the State of California's suit and the various class action suits was by then being reflected in adverse sales results in the realty operations. Boise's projections indicated that by the end of the year it would be in default under many of the serious covenants of its loan agreements unless it obtained waivers or other modifications of the loan agreements by that time. It was clear that neither Boise nor Home & Land could borrow additional funds to fund their cash requirements. As a result, a divestiture program was undertaken to generate cash.

7. By mid-year 1972, when realty sales fell substantially below projections, it was determined that consideration must be given to discontinuing and liquidating Home & Land's realty operations. This decision would result in an extraordinary charge to consolidated earnings of $210 million ($150 million net after tax).

8. The foregoing decision was taken only after conferences with all lenders inasmuch as the effect of such charge would have put Boise in default under its loan agreements. Trading in Boise's stock was suspended for slightly more than one day to enable Boise to confer with lenders prior to making a public announcement that consideration was being given to this course of action. Prior to the time the decision was made Boise received temporary waivers of its loan agreement violations. During the course of negotiations with lenders a serious conflict arose between the insurance companies who took the position that the financial problems were those of Home & Land and the banks who took the position that these were over-all Boise problems. As a result of the extraordinary charge Home & Land had a deficit net worth.

9. Because of the serious financial position of Boise and Home & Land, discussions with lenders continued on almost a daily basis. The long-range objective of these discussions was to in some manner restructure the financing of Boise and of Home & Land in order that both companies could

continue to operate. An immediate objective was to cure the deficit net worth position of Home & Land, not only because it was required to file financial statements with the office of Interstate Land Sales, a part of the Federal Department of Housing and Urban Development which had threatened to suspend all remaining land sales activities, but also to permit Home & Land to continue maintenance and completion of projects as Boise had committed to do. Consent of the insurance companies was finally obtained to permit Boise to assume $125 million of Home & Land's $200 million revolving bank line of credit, the effect of which was to increase Boise's investment in Home & Land by $125 million and cure its deficit net worth. Throughout the latter part of 1972, with the consent of the insurance companies, Boise also made net additional advances to Home & Land in the amount of $64 million.

10. Concurrently, with the negotiations with the lenders, negotiations also commenced with the public and private attorneys in an attempt to settle the California litigation. Lenders continued to grant temporary waivers but clearly indicated it would be difficult to proceed with restructuring Boise's over-all loan agreements unless the liability with respect to the California litigation could be quantified and settled. Messrs. John Fery, President of Boise, Will Storey, Vice President and Controller, and I, together with other Boise representatives, conducted meetings with public and private attorneys handling the California litigation against Home & Land to explain the serious financial difficulty of Home & Land and Boise. In the first of these meetings, involving extensive negotiations with the public attorneys, the extraordinary charge of $210 million was analyzed in detail, and certain reallocations were made in order to increase the negotiated settlement amount to the maximum dollar amount available within the charge.

Lenders continued to monitor the progress of the California settlement negotiations.

11. The California settlement negotiations finally resulted in the execution of a Settlement Agreement in mid-February, 1973. Negotiations with lenders culminated with amendments to Boise's insurance company loan agreements and a new Credit and Security Agreement between Home & Land and the lending banks, all of which were dated as of March 12, 1973. Until this date Boise continued to operate on temporary waivers which if not extended from time to time would have permitted its lenders to exercise their rights under the loan agreements.

12. The new Boise loan agreements as restructured contain restrictive covenants and, among other things, require (which has been accomplished) that the loans be secured and that Home & Land continue its course to liquidate the realty operations. By the time the restructuring was executed, Boise had accomplished its divestiture program, which resulted in it making substantial debt payments (approximately $240 million) and resulted in $44 million flowing directly into Home & Land to provide the necessary funds to comply with the California Settlement Agreement. As part of the restructuring the lenders have consented to the performance of the Settlement Agreement by Boise and by Home & Land.

(s)_____
EDWARD W. CLEARY

Subscribed and sworn to before me
this __14__ day of May, 1973.
(s)_____
Josephine Hulsman

NOTARY PUBLIC in and for the City
and County of San Francisco,
State of California

JOSEPHINE HULSMAN
My Commission Expires Nov. 4, 1975 [SEAL]

Appendix B to follow.

## APPENDIX B

### $58.5 Million

# Boise Financial Plight Led to Suit Settlement

*By Mitchell Thomas*

Fears that the giant Boise Cascade Corp. might be going broke led the California attorney general's office to accept a half-a-loaf settlement of six big suits against the company.

"It is the best settlement we could have gotten without forcing them into bankruptcy," said Attorney General Evelle J. Younger, who announced the agreement Monday after it was approved by Boise Cascade's directors.

"We were potentially looking at a situation where we were going to be trying to get blood out of a turnip," a source in the attorney general's office said yesterday.

That, the source said, was why the State agreed to a settlement totaling $58.5 million in six class action suits. In them, Boise Cascade was charged with using false and misleading practices to sell an estimated $360 million worth of recreational land in California.

#### VIEW

Boise Cascade, one of the wonders of the modern financial world, conceded that it was happy about the settlement, but denied vigorously that it was in any danger of folding up.

"We're hopeful that very shortly we can put most of our problems behind us," said Sam Donaldson, a spokesman at the firm's Palo Alto office.

Boise Cascade's problems—some of them, at least—have been no secret for some time. Its profits and stock prices have taken huge dips.

The company has been selling off some of its assets negotiate many of our loan agreements...

"But to say the bankers forced us to the settlement is absurd."

"The land business has been a very costly one for Boise Cascade," Donaldson said. "It did not make much sense to pour good money after bad."

He said that during the past year the company sold some major assets and set up a $200 million fund for the purpose of phasing out its recreational land business and liquidating some foreign investments.

Donaldson said some of the proceeds from the property sales were used to reduce debts. The $200 million fund was listed as an extraordinary charge against income.

Since the company's actual net operating income for the first six months of this year was not quite $4 million, Boise Cascade reported a net loss of $196 million for the six-month period.

In October, however, the company reported that its net income for the third quarter of 1972 was $10.9 million, up from $2.4 million for the same period last year.

Also in October, R.V. Hansberger resigned as Boise Cascade's board chairman and chief executive. Hansberger had been credited with building the firm from a moderate-sized Idaho lumber company into an international conglomerate with sales of nearly $2 billion a year.